## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| **PAUL ALBEE, Individually and derivatively** | : | |
| **on behalf of Aromatic Fusion, Inc.** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| **v.** | : | |
| **ERIC ALBEE** | : | **No.  21-cv-3984** |
| **and** | : | |
| **WHITEBEAR TRADING COMPANY** | : | |
| **Defendants** | : | |
| **and** | : | |
| **AROMATIC FUSION, INC.** | : | |
| **Nominal Defendant** | : | |

---

| | |
|---|---|
| **ERIC ALBEE and AROMATIC FUSION, INC.** | : |
| **Counterclaim Plaintiffs** | : |
| **v.** | : |
| **PAUL ALBEE** | : |
| **Counterclaim Defendant** | : |

---

| | |
|---|---|
| **ERIC ALBEE and AROMATIC FUSION, INC.** | : |
| **Third Party Plaintiffs** | : |
| **v.** | : |
| **MARY ANN ALBEE, SANDRA ALBEE** | : |
| **KEELEY and P3N TECHNOLOGY INC.** | : |
| **Third Party Defendants** | : |
| | : |

---

### PROPOSED FINDINGS OF FACT AND CONCLUSION OF LAW OF DEFENDANTS/COUNTERCLAIMANTS/THIRD PARTY PLAINTIFFS
<u>**ERIC ALBEE, WHITE BEAR TRADING COMPANY AND AROMATIC FUSION, INC.**</u>

Defendants/Counterclaimants/Third Party Plaintiffs Eric Albee ("Eric"), White Bear

Trading Company ("White Bear") and Aromatic Fusion, Inc.  ("AFI") (hereinafter collectively

"the Eric Albee Parties"), by and through their undersigned counsel, respectfully submit the

following proposed Findings of Fact and Conclusions of Law which they respectfully request

that this Honorable Court adopt.

## INTRODUCTION

The present litigation is an extremely uncomfortable and unnecessary family dispute between father and son over a financially struggling and failing company that only Plaintiff/Counterclaim Defendant Paul Albee ("Paul") wishes to continue to operate so he can use it to house and run his separately owned consulting company Third Party Defendant P3N Technology Inc. ("P3N").  Moreover, Paul first initiated this "slap suit" litigation against his son Eric and White Bear, a fragrance marketing company based in Florida owned in part by Eric, only after Eric confronted Paul regarding Paul's unlawful diversion of business opportunities from their jointly owned fragrance company AFI as well as his diversion of AFI customers and payables to P3N and his personal consulting account; Paul's misuse of AFI trade secrets, and, together with his wife Third Party Defendant Mary Ann Albee ("Mary Ann") and their daughter Third Party Defendant Sandra Albee Keely ("Sandra"), Paul's unauthorized reimbursement for non-existing or unauthorized loans in part to cover up the theft of AFI funds by his sister Sandra. To punish Eric, in this lawsuit, Paul asserts unsupported claims against Eric for breach of fiduciary duty, oppression of a minority shareholder and tortious interference with contractual relations and claims against White Bear for tortious interference with contractual relations and unjust enrichment.

Based upon Paul's initiation of that lawsuit, Eric was forced to pursue well-documented claims on his own behalf and AFI against his father, mother and sister for breach of fiduciary duty and duty of loyalty, tortious interference with existing and prospective contractual relations, embezzlement/fraudulent conversion, violations of the federal Defense of Trade Secrets Act ("DTSA"), and violations of the Pennsylvania Uniform Trade Secrets Act ("PUTSA) all of which contributed to the failure of AFI as a sustainable entity.  Eric and AFI also bring third

party claims against Sandra and Mary Ann for aiding and abetting the breaches of fiduciary duties, tortious interference and embezzlement/conversion by Paul and assert third party claims against his father's wholly owned company P3N for violations of the DTSA and PUTSA.

A five-day bench trial was held on June 12, 2023, June 13, 2023, June 14, 2023, June 20, 2023 and June 21, 2023.  The parties have jointly moved the following exhibits into evidence: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 31, 33, 34, 35, 36, 40, 41, 49, 51, 52, 58, 60, 61, 73, 82, 83, 85, 86, 87, 88, 89, 90, 91, 92, 93 ,94, 95, 96, 105, 106, 107, 108, 109, 113, 115, 116, 126, 127, 128, 130, 141, 142, 143, 144, 146, 147, 149, 150, 151, 152, 153, 155, 156,  157, 158, 159, 160, 161, 162, 165, 170, 171, 172, 174, 176, 182, 184, 185, 186, 188, 189, 190, 191, 192, 193, 194, 195, 196, 198, 203, 204, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 239.  Having reviewed the Proposed Findings of Fact and Conclusions of Law submitted by the Parties, the trial exhibits and the transcribed notes of testimony ("NT"), the Court now makes the following Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

### **The Albees And AFI**

1.      Eric Albee is a graduate from Bryant University with a Bachelor's Degree in Marketing.  June 14, 2023 N.T., p. 8:2-7.

2.      He became involved in the fragrance infusion industry at the early age of 13 when he spent vacation and summers working at Polyvel, a company that his father Paul owned.  *Id*; pp. 8:13-22, 9:17-25.

3.      Initially, Eric would help mix formulas in the family garage until Polyvel had a warehouse and then he began working there.  *Id*; pp. 8:19-20, 10:6-11.

4.      After working in the warehouse doing labor, Eric proceeded to work with machines and learn about the equipment along with learning about materials and processes.  *Id*; pp. 8:20, 10:10-12.

5.      Eric became passionate about the fragrance product industry and ultimately found a "niche" in that area.  *Id*; pp. 8:20-22, 10:17-18.

6.      After graduating college in 1993, Eric went to work for his father at Polyvel on a full-time basis until 2003 when, following Paul's departure, he went to work with his father at the ROWA Group, a company that was involved in chemical filming agents and additive concentrates.  *Id*; pp. 11:15-17, 12:21-23, 14:5-10.

7.      While at ROWA, Eric started his own non-competitive unincorporated entity AFI which is a company that manufactures and distributes scented products such as candles and incense sticks.  *Id*; pp. 15:25-16:3.

8.      Throughout its existence, AFI both manufactured and marketed fragrance and additive products which each involve different processes and services.  June 12, 2023 N.T., pp. 192:12-193:1

9.      Eric incorporated AFI with his sister, Sandra, on March 17, 2003 in New Jersey and each were fifty percent (50%) shareholders.  June 12, 2023 N.T., pp. 53:4-16, 54:20-55:8, 63:1-4.  See generally Exhibit 1 [Articles of Incorporation].

10.      AFI was initially based out of Eric's house until the company moved to a rented facility in Bensalem, Pennsylvania.  June 12, 2023 N.T., p. 18:4-19:1.

11.      AFI has maintained its sole place of business and all of its operations in Bensalem, Pennsylvania.  June 12, 2023 N.T., pp. 63:15-64:6; Exhibit 33 [Aromatic Fusion Corporate Data].

12.     All of the actions addressed in the original lawsuit and the counterclaims arise out of actions and issues that occurred in Pennsylvania.

13.     Eric was appointed as the President of AFI and Sandra was the Secretary and Treasurer.  June 12, 2023 N. T., p. 57:13-17.

14.     Eric left ROWA in 2008 and thereafter devoted his full-time efforts to working for AFI with Sandra who was also working full time at AFI as a salaried employee.  June 14, 2023 N.T., p. 21:4-21.

15.     Throughout her tenure, Sandra was primarily responsible for the non-operational financial side of the company including maintaining the finance books and records.  June 12, 2023 N.T., p. 127:13-19.

16.     Paul initially became involved with AFI in 2007 while he was still working at ROWA and worked with his children on different projects.  June 12, 2023 N.T., pp. 122:15-123:1.

17.     Paul officially joined AFI following his retirement from ROWA in 2010.  June 14, 2023 N.T. pp. 149:25-150:7.

18.     Prior to that time, Paul brought a small extruder to AFI's facilities that he was given from one of his former employers.  June 12, 2023 N.T., p. 125:7-16; June 20, 2023 N.T., pp. 14:17-15:10.

19.     When Paul joined AFI following his leaving ROWA, he brought a small microscope with him as well as a few small kettles.  June 20, 2023 N.T., pp. 14:21-15:15.

20.     In order to entice him to join AFI and contribute to the then growing company by developing technology for an additive concentrate line and assisting AFI in securing loans to

grow the business, Paul was given 42% of the stock ownership.  June 14, 2023 N.T., pp. 22:25-23:4.

21.    To facilitate the transfer of 42% of AFI's stock to Paul, Sandra's ownership was reduced to 8% thereby satisfying Sandra's needs of not wanting to sign any loans on behalf of AFI.  June 14, 2023 N.T., p. 23:5-25.  See also Exhibit 33 [Aromatic Fusion Corporate Data: Stock Shares Resolution 03/2010].

22.    Paul never paid any money for his 42% of shares in AFI but contributed the use of the aforesaid equipment he brought to AFI.  June 12, 2023 N.T.,  pp.  63:15-18, 125:12-126:10.

23.    Paul is not nor was he ever an employee of AFI and, other than the use of a company car, he does not receive compensation from AFI.  June 14, 2023 N.T., pp. 153:15-154:19.

24.    As a shareholder at AFI, Paul has always primarily worked on additive concentrate processes that were under the Addisperse Division of AFI including working with nanotechnology and other materials that could be put into plastics to enhance the physical properties of finished goods.  *Id*; pp.  23:20-26:3.

25.    AJ Campione ("AJ"), who worked with both Paul and Eric at Polyvel and ROWA, began working at AFI in late 2010 as an operations employee.  June 12, 2023 N.T., pp. 185:1-187:12.

26.    AJ was initially responsible for production and eventually he took over more responsibility including purchasing, servicing customers, and sales.  *Id*; p. 191:4-20.

27.     By 2010, as a result of a product it developed for Bath and Body Works known as the "Scentbug" that was branded under Slatkin and Company which was owned by Harry Slatkin ("Harry"), AFI was doing well and was profitable.  June 12, 2023 N. T., pp. 72:3-79:16.[1]

28.     Due to its financial stability, AFI was able to secure two lines of credit each for $250,000 in order to grow the company and use solid gel materials to develop car air fresheners and other scented products.  June 14, 2023 N.T., pp. 26:4-27:13.

29.     The first line of credit was a working capital loan that is guaranteed by both Paul and Eric and is still active with interest only payments. *Id*; pp. 27:23-28:9, 155:20-23.

30.     Initially, that loan was collateralized by Eric's home; however, after his divorce and eventual move to Florida, Paul and Mary Ann voluntarily offered to collateralize the second loan with their home in Lambertville, New Jersey.  June 13, 2023 N.T., p. 195:8-19; June 14, 2023 N.T., p. 28:1-20.

31.     The second line of credit was a small business loan and has been fully paid off. June 14, 2023 N.T., pp. 27:14-22, 155:23-156:4, 197:17-19.

32.     In 2014, Eric moved to Florida and split his time working for AFI at its headquarters in Bensalem, PA and from his home in Florida.  June 14, 2023 N.T., pp. 160:15-161:6.

33.     While as part of his allegations against Eric, Paul contends that Eric's sales and business generation efforts diminished when Eric moved to Florida, Paul has produced no

---

[1] Harry Slatkin was an employee of Bath and Body Words and certain products including the "Scentbug" product were branded under his company's name.  *Id*; p. 73:13-21.  The Scentbug sales ended in 2013 after Ms. Slatkin left Bath and Body Works and the company eliminated the product from their product line.  *Id;* pp. 81:20-82:6.

documentation to demonstrate the amount of sales or productivity by Eric from 2010 through the present.  June 14, 2023 N.T., p. 160:15-161:18; June 20, 2023 N.T., pp. 90:18-93:9.

### White Bear Trading Company

34.     White Bear is a marketing company that facilitates the production of scent-based products.  June 13, 2023 N.T., pp. 122:10-123:14.

35.     Prior to its incorporation in 2016 affected to protect its assets and take on new business, White Bear was a name that Eric used for a consulting project.  June 14, 2023 N.T., pp. 36:13-37:8.

36.     Eric eventually incorporated White Bear Trading Company as a Florida limited liability company on October 24, 2016.  June 13, 2023 N.T., p. 120:8-19.  *See generally* Exhibit 4 [White Bear Trading Company Articles of Incorporation].

37.     Eric decided to incorporate White Bear at this time because he was entering into a contract with a company known as PLZ Aero Science to consult on a fitment issue that the company had with fragranced oil on a bottle cap.  June 14, 2023 N.T., p. 99:3-8.

38.     Ryan Willits ("Ryan"), an attorney in Florida, is Eric's business partner in White Bear.  June 13, 2023, N.T., pp. 121:19-21.

39.     Eric owns 60% of White Bear and Willits owns the other 40%.  *Id*; pp. 121:25-122:4.

40.     Eric and White Bear also manufacture and market products through a product line designated as Aroma 43 which was originally used by Eric when he operated a sole proprietorship selling candles and scented reeds.  June 14, 2023 N.T., p. 37:4-11.[2]

---

[2] Eric, through White Bear, bought the reeds from AFI and infused oil into them after purchase. June 13, 2023 N.T., pp. 53:17-54:6; 225:17-25; June 14, 2023 N.T., pp. 37:15-38:5.  Paul

41.    The existence of White Bear was known to AFI including AJ who confirmed during his trial testimony that he knew of White Bear as well as Aroma 43.  June 12, 2023 N.T., p. 205:9-25.

### The HomeWorx Project

42.    In the Fall of 2016, Harry Slatkin, known on the industry as the "King of Fragrance" products reached out to Eric about making a product to sell on QVC.  June 14, 2023 N.T., pp. 52:2-53:8.

43.    Based upon their initial meeting, Eric presented Harry with different product ideas including a little floral petal to be used as an alternative to fragrance emitters including wax melters and flameless candles.  *Id*; p. 53:6-15.

44.    Harry wanted to put together a product that involved a custom designed gel based fragrance emitters that went into a warmer for diffusion of fragrance into the air.  *Id*; p. 53:20-25.

45.    After discussions continued about a possible project, Harry decided to move forward with a Christmas ball shaped ornament that would dispel fragrance though a gel disk placed in the center of the ornament.  *Id*; pp. 54:10-55:6.  *See generally* Exhibit 8 [Photograph of Different Colored Items].

46.    It was resolved that the project would be done with Harry's new company HomeWorx LLC which was formed after Harry's initial meeting with Eric and AFI entered in a vendor form agreement with HomeWorx and signed a new NDA with HomeWorx.  June 13, 2023 N.T., pp. 139:21-142:20; June 14, 2023 N.T., p. 54:9-19.

47.    The design element of the product was the Christmas Ball ornament that Harry had

---

conceded that Eric never sold fragrance infused reeds individually but could sell the reeds as long as purchased from AFI.  June 20, 2023 N.T., pp. 89:5-90:12.

previously designed while working at Bath and Body Works and was not designed by AFI.  June 12, 2023 N.T., pp. 141:21-143:2; June 14, 2023 N.T., pp. 49:15-51:23.

48.     Thereafter, AFI began performing some sampling work for HomeWorx which involved manipulating shapes, fragrances and colors to create a product that met HomeWorx's needs.  June 12, 2023 N.T., p. 194:8-24; June 13, 2023 N.T., p. 144:3-24.

49.     HomeWorx wanted eight to ten different samples made which generally took about 15-30 minutes for each and involved color work.  June 13, 2023 N.T., p. 144:3-15.

50.     AFI did not complete any fragrance work for the project because HomeWorx prepared and delivered the fragrance oils to AFI.  *Id*; p.16:21.

51.     The molds were also done by an outside company and not AFI.  June 12, 2023 N.T., p. 190:12-25.

52.     While some work went into making the colors and perfecting the matches, the work performed by AFI was not massive or finalized and did not even get as far packaging.  June 12, 2023 N.T., pp. 196:22-197:6; June 13, 2023 N.T., p. 144:4-15.

53.     Initially, Eric and AJ expected that the HomeWorx project would be produced in the United States at the AFI facility.  However, due to the volume anticipated by HomeWorx and the timing requirements to complete the project for Christmas holiday, AJ and Eric determined that AFI did not have the capacity to complete production and that it would need to be completed by a China-based manufacturer which involved a different level of logistics, coordination, financial management, funding and manpower.  June 12, 2023 N.T., pp. 197:14-198:16; June 14, 2023 N.T., p. 66:2-10.

54.     The volume requested by HomeWorx approached a million pieces and AJ testified that the project was not one that AFI could complete at its facility:

> I just knew it was a lot and it wasn't something we can do.  We
> needed equipment.  We would need more room and more people.  I
> mean we could have hired on, possibly, but it was too much for
> that facility.

June 12, 2023 N.T., p. 197:20-198:16.

55.     It was decided and it is undisputed that AFI could not complete the project without using a factory in China for production.  *Id*; p. 97:2-7.

56.     In the past, AFI had used a factory in China which was facilitated through a Hong Kong broker company owned by Charles Ye known as Wealthy Lane.  June 12, 2023 N.T., pp. 75:15-76:12, 94:14-95:1.

57.     At the time of the HomeWorx project, AFI had an outstanding debt owed to Wealthy Lane of more than $140,000.00.  June 13, 2023 N.T., p. 168: 9-22; June 14, 2023 N.T., p. 61:6-9.

58.     In light of the volume and money anticipated to be incurred in the HomeWorx project, Wealthy Lane wanted a higher deposit to manufacture the product and wanted the outstanding debt of more than $140,000.00 to be paid off before beginning the work on the HomeWorx project.  June 14, 2023 N.T; pp. 60:8-61:5.

59.     It is undisputed that AFI did not have funds or the credit to pay to off the debt and did not have the money to make the deposits required by Wealthy Lane to have the manufacturing necessary to complete the project in the Wealth Lane designated factory in China. June 12, 2023 N.T., p. 155:9-156:5; June 14, 2023 N.T., p. 61:14-17.

60.     AFI's lines of credit were maxed out and AFI could not utilize other factors or resources to proceed with manufacturing in China.  June 12, 2023 N.T., p. 156:3-6; June 14, 2023 N.T., pp. 61:18-62:10.

61.     In fact, Sandra specifically advised Eric that AFI could not pay China off to complete the project.  June 13, 2023 N.T., pp. 170:24-171:3.

62.     Accordingly, because AFI was unable to complete the manufacturing of the HomeWorx product due to its financial condition, Eric was forced to have the HomeWorx project transferred to White Bear.  June 14, 2023 N.T., p. 62:11-17.

63.     Eric chose White Bear because there was a great deal of financial management required in completion of the project, his partner Ryan had excellent credit to secure the necessary deposits and Ryan had proven to individuals in China that he would honor financial obligations.  *Id*; p, 68:4-24.

64.     Eric spoke with his sister about these issues and advised her that he was transferring the projected HomeWorx project to White Bear to complete.  *Id*; pp. 62:11-63:1.

65.     While Sandra denied at the time of trial that she was aware that the HomeWorx project was transferred to White Bear and contends that Wealthy Lane forgave the debt, Plaintiff has provided no evidence confirming that Charles Ye ever wiped the debt owed by AFI as Sandra now claims.  June 12, 2023 N.T., pp. 99:19-25, 128:14-129:15.[3]

66.     In fact, when Diane Aiello ("Diane") became AFI's office manager and took over its bookkeeping responsibilities, she was not made aware such a resolution of the debt had been affected.  June 13, 2023 N.T., pp. 61:7-17, 87:11-13.

67.     Further, while during the trial Plaintiff attempted to support the position that there was not ongoing debt obligation owed to Wealthy Lane by alluding to work done with AFI for an AFI customer Gold Canyon, in that project, Gold Canyon was fully responsible for the

---

[3] Paul acknowledged speaking with Mr. Ye about the balance and, tellingly, he never even testified that the debt was forgiven.  June 20, 2023 N.T., p. 12:2-10.

payment to the designated China factory and, unlike the Homeworx project, AFI was not obligated for the payment in case of default in payment by Gold Canyon.  June 12, 2023 N.T., pp. 159:24-163:7.

68.     Likewise, while Paul testified that manufacturing orders were never rejected by Wealthy Lane after March 2017,  Plaintiff has presented absolutely no evidence regarding the volume or costs associated with any such orders to allow any inference that Wealthy Lane would have approved an order as large and costly as the HomeWorx project.  June 20, 2023. N.T., p. 12:14-19.

69.     When the decision was made that White Bear would be the chosen entity to complete the HomeWorx project, Eric advised HomeWorx employees, Jimmy LaFever and Yvonne Franco, in writing, that the HomeWorx project was being transferred to White Bear to manage due to the tight time requirements and the need to change production to China-based manufacturing.  June 14, 2023 N.T., pp. 63:2-9, 65:17, 67:2.  See also Exhibit 11 [Eric Albee email to Yvonne Franco].

70.      Eric specifically advised Ms. Franco that there would be a shared technology arrangement between AFI and White Bear with respect to the gel disks on which AFI had done work.  *Id*; pp. 66:17-67:17.

71.     The terms of that shared technology agreement were pursuant a discussion that Eric had with Sandra wherein he advised her that White Bear would make a payment to AFI for using the  technology.  June 13, 2023 N.T., pp. 154:1-155:20; June 14, 2023 N.T., p. 67:3-17.

72.     Eric testified that it was agreed that there would be a flat fee for the use of AFI's

technology which was originally planned to be $30,000.00 but increased to $50,000.00 since the project had grown by the time of the actual payment.  June 13, 2023 N.T., pp. 158:16-161:6; June 14, 2023 N.T., pp. 70:21-71:1.[4]

73.     In accordance with that agreement, a royalty payment from Whitebear to AFI in the amount of $50,000.00 was made.  June 14, 2023 N.T., p. 70:17-71:11.

74.      Ryan made the transfer of $50,000.00 to AFI through his law firm's IOLTA account used for dealing with client-based monies because he had an arrangement with Bank of America that allowed for outgoing wires from that account without incurring a fee for that service.  June 14, 2023 N.T., pp. 72:21-73:6; Exhibit 16 [$50,000.00 Wire Transfer].

75.     Paul, AJ and Diane all acknowledged receiving the $50,000.00 wire transfer.  June 12, 2023 N.T., p. 204:8-10; June 13, 2023 N.T., pp. 61:9-14, 76:22-79:7; June 20, 2023 N.T., pp. 81:16-22.

76.     While Paul disingenuously testified that he did not know what the $50,000.00 wire represented, without even first gaining Eric's permission, AFI applied $20,000.00 of the funds towards company operations and paid Mary Ann the remaining $30,000.00 from those funds as payment for an alleged loan previously made by her to AFI.  June 13, 2023 N.T., p. 93:7-22.

77.     After receiving the wire transfer, Paul admits that he learned that White Bear took over the HomeWorx project in late 2017 when he saw an advertisement for Christmas balls on QVC.  June 14, 2023 N.T., pp. 191:11-194:1.

---

[4] Eric created the invoice for White Bear to make the agreed payment.  June 13, 2023 N.T., p. 190:1-5; June 14, 2023 N.T., pp. 71:16-72:8. Although the invoice was not the typical one used by AFI at the time, the company was transitioning into using QuickBooks and Eric was not aware of invoicing through that financial program.  *Id.*  See generally Exhibit 15 [Invoice for $50,000.00].

78.     While at trial Paul contended that AFI would have made $700,000.00 to $800,000.00 from the HomeWorx project that he estimates was worth $1.5 million in total, Plaintiff did not present any testimony to support these contentions.  June 20, 2023 N.T., pp. 105:24-106:4.

79.     In fact, other than referencing the price sheets and volume requirements for the HomeWorx project and making generalizations about the margin percentages in the industry, Plaintiff did not present any accounting testimony or testimony from any expert witness to address Paul's unsupported allegations regarding any profit that AFI would have made if it retained the HomeWorx project.  *Id*; p. 106:1-108:1.

80.     Contrary to Paul's unsupported assertions, White Bear's 2017 tax return for the year that the HomeWorx project was completed demonstrates that White Bear only had net income of $417,000.02 for all the work done that year including but not limited to the HomeWorx project.  June 14, 2023 N.T., pp. 74:16-76:9; June 20 2023. N.T., pp. 108:19-110:5. See generally Exhibit 18 [2017 White Bear Trading Company Tax Return].

81.     In his trial testimony, Eric confirmed that the HomeWorx project was certainly not the only source of income for White Bear that year.  June 14, 2023 N.T., p. 76:3-9.

**Sandra's Resignation And AFI's Financial Demise**

82.     Based upon the mounting monetary difficulty that AFI was experiencing, Eric initiated an investigation into the finances of the company to determine a reason that AFI was experiencing a decline in the generation of enough money to pay its bills.  June 14, 2023 N.T., pp. 30:7-25, 31:5-21.

83.     At the time, Eric was not paying much attention to AFI's finances because his sister was handling the financial side of the company.  *Id*; p. 31:18-21.

15

84.     Much to his chagrin, Eric's investigation uncovered that his sister was stealing money from AFI to pay, inter alia her mortgage company and credit cards. *Id*; p. 31:22-15.

85.     Eric also discovered that she was transferring money out of the company account to her personal bank account. *Id*; p. 32:5-6.

86.     Based upon his full review of the company's books, Eric determined that Sandra had stolen an estimated $683,000.00 from AFI. *Id*; p. 32:16-18.

87.     Paul had been out of work following heart surgery for about three months during the time of Eric's audit of his sister's actions, but Eric put together two large binders detailing Sandra's conduct and waited until Paul returned to work to show his father what he had discovered regarding Sandra's theft. *Id*; pp. 32:19-33:7.

88.     Confronted with the evidence of Sandra's wrongdoing, Paul found it very upsetting that Sandra took money from the company to pay for personal items. *Id*; p. 178:2-9.

89.     Eric and Paul thereafter confronted Sandra regarding her financial transgressions and Sandra promptly resigned from the company on June 19, 2017 as well as forfeited all ownership of AFI. *Id*; pp. 33:18-34:1.

90.     Sandra's shares of stock in AFI were divided equally between Eric and Paul bringing their respective shares to 54% and 46% respectively.  June 12, 2023 N.T., pp. 66:19-68:11; June 13, 2023 N.T., pp. 126:14-127:3; June 14, 2023 N.T., p. 34:4-5.  *See also* Exhibit 34 [Corporate Resolution of AFI, dated June 20, 2017]; Exhibit 35 [Resignation Agreement].

91.     Although AFI's resources were greatly depleted by Sandra's illegal actions, neither AFI nor Eric has taken any criminal action against Sandra and, to date, Sandra has never paid back any of the money to AFI, her brother or her father.  June 14, 2023 N.T., pp. 34:6-35:17.

92.     Diane confirmed that the money taken by Sandy would have been helpful in keeping AFI afloat and getting the bills paid.  June 13, 2023 N.T., p. 102:12-17.

93.     Reflected in her trial testimony against her brother, Sandra has remained angry and bitter over her brother's revealing her unlawful behavior and does even let him see her children.  June 14, 2023 N.T., pp. 34:6-35:3.

94.     While Eric continued his efforts for AFI after he moved to Florida, AFI's business significantly declined by 2019 forcing Eric to stop taking a salary from AFI and thereafter to resign as an employee so he could cash out his 401K.  June 14, 2023 N.T., pp. 30:21-31:4, 38:6-23.

95.     Even after he resigned, Eric invested an additional $10,000.00 into AFI in order to pay bills.  June 13, 2023 N.T., pp. 92:9-93:1; June 14, 2023 N.T., p. 38:6-23.

**Paul's Usurping Of Corporate Opportunities And Theft Of Trade Secrets**

96.     In 2020, while helping set up Paul's AFI emails on a new computer he had purchased, Eric discovered that Paul was personally paid substantial money performing services for various companies using trade secret processes that were developed at AFI.  June 14, 2023 N.T., pp.  38:24-39:19, 41:4-44:13.

97.     In part, Paul was performing these consulting services through P3n, a separate company formed by Paul in 2018 which he never disclosed to Eric.  June 14, 2023 N.T., p. 150:16-19; June 20, 2023 N.T., p. 98:16-22.

98.     Paul also never disclosed to Eric that he was performing consulting services through P3n.  June 20, 2023 N.T., p. 98:19-22.

99.     Eric was concerned about what he discovered on Paul's AFI computer including a consulting agreement Paul entered into with company known as AVAPCO[5] which involved the sharing of information related to nanocellulose technology that AFI had been focusing on since as early as 2013.  June 14, 2023 N.T., pp. 24:16-24, 41:3-19.  *See generally* Exhibit 156 [Consulting Agreement between AVAPCO and Paul Albee].

100.     Although at trial Paul asserted that the work he did for AVAPCO did not involve AFI trade secrets, the work was clearly based upon work performed by Paul at AFI using AFI equipment and personnel related to developing dispersion technology, nanocellulose filler and nanochitin whiskers.  June 20, 2023 N.T., pp. 37:2-10, 130:24-131:25.

101.     Paul worked as much as ten (10) hours per day on the AVAPCO project and earned $16,000.00 per month from AVAPCO for more than a one year period.  *Id*; pp. 129:16-131:6.  *See generally* Exhibit 83 [Paul Albee AVAPCO Project Time Sheet].

102.     Eric also discovered that Paul engaged in similar conduct with respect to work he performed for other companies including Plastiques Lausa, SP Films, Trigon and Milliken & Co.  June 14, 2023 N.T., pp. 43:15-43, 84:21-86:15, 102:21-103:10; June 20, 2023 N.T., pp. 137:18-138:4.

103.     With respect to SP Films, Paul charged the company $11,400.00 in 2016 and the money was never received by AFI.  June 14, 2023 N.T., pp. 87:16-88:4.  *See also* Exhibit 210 [Anti-Fungal Performance of Concentrated project from Paul to Roberto Galvez, dated February 15, 2016].

104.     Paul, with the assistance of Mary Ann and Sandra, also invoiced SP Films for $12,750.00 which was never received by AFI.  June 14, 2023 N.T., pp. 89:4-92:22.  *See also*

---

[5] AVAPCO is also known as GranBio.  June 20, 2023 N.T., p. 16:5-11.

Exhibit 213 [Invoice from Paul Albee to Robert Galvez, dated March 17, 2016]; Exhibit 214

[Proof of Foreign Exchange Operation, March 14, 2016]; Exhibit 217 [Email from Sandie

Keeley to SP Films, dated March 30, 2016; and Exhibit 219 [Email from Sandie Keeley to Paul

Albee and Admon with copy to Galvez re: FDA AO 2010, dated April 7, 2016].

105.    On another occasion, Paul sent a personal invoice to SP Films in the amount of

$4,500.00 for work done at and by AFI.  June 14, 2023 N.T., pp. 93:22-94:22; Exhibit 229

[Invoice from Paul Albee to Galvez, dated August 4, 2015].

106.    In addition, Paul diverted $4,200.00 from Trigon Plastics and $4,612.10 from

Milliken & Co. for work that should have been performed through AFI but was done through

P3n.  June 14, 2023 N.T., pp. 102:21-103:10; June 20, 2023 N.T., pp. 137:18-138:2.  *See*

*generally* Exhibit 143 [P3n Technology Invoice to Milliken & Co, 8/21/19]; Exhibit 182 [P3n

Technology invoice to Trigon Plastics, dated June 10, 2020].

107.    Paul and P3n did not have a separate facility with extruders so all the work

performed by his wholly owned company P3n was done at and used the equipment at AFI.  June

13, 2023 N.T., p. 42:6-9.

108.    While Paul contends that the equipment remains his property, Eric confirmed that

Paul was well compensated for any equipment brought to AFI through cash compensation and

getting 42% stock ownership of AFI when he joined.  June 14, 2023 N.T., pp. 121:8-122:14;

June 20, 2023 N.T., p. 15:16-25.

109.    Regardless of equipment ownership, AFI paid for the installing, maintenance and

electricity used to run the equipment.  June 14, 2023 N.T., p. 122:9-14.

110.    In addition to diverting the above opportunities, Paul published an article on

behalf of P3n Technology by using prior work that Paul had performed and published for AFI

through Addisperse.  June 13, 2023 N.T., pp. 32:1-35:3; June 14, 2023 N.T., p. 43:9-14.  *See*

*generally* Exhibit 89 [Nanocellulose Fillers in Polymers, dated November 14, 2016]; Exhibit 91

[Dispersion of Nanocellulose Crystals, Nanocellulose Fibers, Chitin Nanowhiskers and

Nanochitosan in Polymers].

111.    AJ confirmed that P3n's article was similar to AFI's publication and both were

written by Paul.  June 13, 2023 N.T., p. 34:21-24.

112.    AJ also confirmed that when working with Paul on projects and consulting

including an outside project he was trying to develop with the Chevron company, AJ was not

paid by Paul Albee or P3n for this separate work and continued to be paid solely by AFI during

that time he worked on matters for Paul and P3n.  At trial, AJ testified:

> Q.    During that same process, did you ever get paid any monies
> from any of the projects that were run, or consulted with or
> dealt with by Paul Albee?
>
> A.    No.
>
> Q.    During that same period of time you were paid throughout
> by just AFI, were you not ?
>
> A.    Yes.
>
> Q.    And if Mr. Albee got work on those projects, you didn't get
> paid by him through P3n at any time?
>
> A.    No.

June 13, 2023 N.T., pp. 26:16-28:5.

113.    Further, while Paul suggests that all of his outside projects through P3n were

intended to foster work for AFI, he presented no documents that AFI generated or received any

work or monies as a result of Paul's outside projects.  *Id*; pp. 30:4-31:14, 44:18-45:2.

**Paul and Mary Ann Continue to Dump Money Into AFI For Illicit Purpose**

114.    Notwithstanding that AFI is a failing or fully failed company, Paul, through Mary Ann and P3n, continues to invest money into AFI under the guise of "loans" without any authorization by Eric and expects repayment.  June 14, 2023 N.T., pp. 198:2-201:17; June 20, 2023 N.T.,  pp. 119:7-122:14.  *See generally* Exhibit 60 [P3n Loans to Aromatic Fusion]; Exhibit 61 [Mary Albee Loans to Aromatic Fusion].

115.    Diane has these funds listed with AFI in a loan account whereby $439,806.00 is owed to Mary Ann and Paul.  June 13, 2023 N.T, pp. 71:19-73:4; June 14, 2023 N.T., pp. 198:9-199:21.

116.    Mary Ann has even charged AFI the cost of continuing her medical benefits well after she stopped working for AFI without any agreement with the company that she had a right to do so.  June 14, 2023 N.T., p.  199:1-12; June 20, 2023 N.T., pp. 119:7-120:6.  *See generally* Exhibit 29 [Loan Account Summary dated May 9, 2023].

117.    Significantly, Paul concedes at trial that neither P3n nor Mary Ann were obligated to loan money to AFI or pay any of its bills and that Eric never signed off on these loans or agreed to repay any of the money that P3n and Mary Ann supposedly lent the AFI.  June 20, 2023 N.T., pp. 120:15-122:2.

118.    While Diane may have signed off as a witness to these alleged loans, she had no authority to sign off on a loan to AFI and there are no official loan agreements entered into by Eric on behalf of AFI with either Mary Ann or P3n.  *Id*; pp. 122:7-10.

119.    Even though AFI only has one employee remaining since AJ left the company just weeks before the trial because AFI could not pay his salary or meet payroll, Paul still refuses

to dissolve AFI because he believes without any support that it "should be profitable."  June 12, 2023 N.T.,  p. 184:6-13; June 23, 2023 N.T., pp. 126:14-127:6.[6]

120.    AFI's expenses continue to increase and, as of June 2023, the balance of its accounts payable was approximately $157,000.00 which was a $60,000.00  increase from the month prior.  June 13, 2023 N.T., p. 109:9-25.  *See also* Exhibits 50 [Aromatic Fusion and Addisperse Accounts Payable Aging Detail from 6/1/23].

## CONCLUSIONS OF LAW

1.    On September 7, 2021, Plaintiff Paul Albee filed a five count Complaint in this Court, individually and derivatively on behalf of AFI against his son Eric and a Florida corporation, White Bear Trading Company ("Whitebear"), asserting the following causes of action: Shareholder Oppression of Paul by Eric (Count I), Breaches of Fiduciary Duty owed to Paul and AFI (Counts II and III), and Tortious Interference and Unjust Enrichment against White Bear (Counts IV and V).  [ECF Dkt 1].

2.    In response to Plaintiff's Claims, and with the Court's approval, the Defendants filed an Amended Answer to the Complaint on behalf of Eric, Whitebear, and averred Nominal Defendant AFI, together with Counterclaims brought individually by Eric against Paul for Breaches of Fiduciary Duty and Duty of Loyalty (Counterclaim Count 1), derivatively by AFI against Paul for Interference with Existing and Prospective Contractual Relations (Counterclaim Count II), by Eric and AFI against Paul for Embezzlement and Fraudulent conversion (Counterclaim Count III), Violations of the Federal and State Trade Secrets Acts (Counterclaim

---

[6] While Paul tries to blame AFI's financial difficulties on the fact that AFI did not retain the HomeWorx project, Paul conceded at trial that AFI's sales and profitability have been negatively affected largely due to the pandemic and the subsequent supply chain problems.  June 20, 2023 N.T., pp. 100:4-101:3.

Counts IV and V) and Corporate Dissolution of AFI (Counterclaim Count VI). [ECF Dkt. No. 35].

3.      Additionally, Eric and AFI brought Third Party Complaints against P3n, Sandra and Mary Ann asserting four Counts as follows: Engaging in With and Aiding and Abetting the Breaches of Fiduciary Duty and Loyalty by Paul brought by Eric and AFI (Third Party Complaint Count 1); Tortious Interference with Existing and Prospective Contractual Relationships brought by AFI against Mary Ann and Sandra (Third Party Complaint Count II); Embezzlement/Fraudulent Conversion brought by Eric and AFI against Sandra and Mary Ann (Third Party Complaint Count III); Violations of the Federal Defense of Trading Secrets Act brought by AFI against P3n  (Third Party Complaint Count IV); and Violations of the Pennsylvania Uniform Trade Secrets Act brought by AFI against P3n (Third Party Complaint Count V).  [ECF Dkt. No. 35]

4.      The relief sought in the actions brought by Eric and AFI include the award of consequential, compensatory and punitive damages, the award of attorney fees and costs, and the ordered dissolution of AFI with the prohibition of any proceeds of the sale of assets being allocated to Paul based upon his significant wrongdoing .

## CHOICE OF LAW

## Application of the Internal Affairs Doctrine

5.      The parties have asserted differing positions regarding the choice of law to be applied in resolving the claims of Paul, Eric and AFI. Paul Albee asserts that New Jersey law controls all the claims set forth in his Complaint, including applying the New Jersey longer statute of limitations in accordance with the Pennsylvania Internal Affairs doctrine set forth at 15

Pa. C.S.A. § 4145 which only disallows **dismissal** of a Complaint filed by a foreign domiciliary

corporation:

**§ 4145. Applicability of certain safeguards to foreign domiciliary
corporations**

(a) **General rule.--**The General Assembly hereby finds and determines that
foreign domiciliary corporations substantially affect this Commonwealth. The
courts of this Commonwealth shall not dismiss or stay any action or
proceeding brought by a shareholder or representative of a foreign domiciliary
corporation, as such, against the corporation or any one or more of the
shareholders or representatives thereof, as such, on the ground that the
corporation is a foreign corporation for profit or that the cause of action
relates to the internal affairs thereof, but every such action shall proceed with
like effect as if the corporation were a domestic corporation. Except as
provided in subsection (b), the court having jurisdiction of the action or
proceeding shall apply the law of the jurisdiction under which the foreign
domiciliary corporation was incorporated.

15 Pa.C.S.A. § 4145

6.        In a post-trial Order [ECF Dkt. 63], this Court held the New Jersey six-year tort

statute of limitations applied and denied the Motion to Dismiss filed by Eric and AFI.  While the

Court held that the internal affairs doctrine denied the relief sought, it did so without the aid of

the trial transcript that better defines the issues as not being subject to the internal affairs of AFI.

Moreover, the doctrine only controls if the challenged actions affect a corporation's relationships

with its shareholders that include steps taken in the course of the original incorporation, the

election or appointment of directors and officers, the adoption of by-laws, the issuance of

corporate shares, preemptive rights, the holding of directors' and shareholders meetings, methods

of voting including any requirements for cumulative voting, shareholders' rights to examine

corporate records, charter and by-law amendments, mergers, consolidations and reorganizations

and the reclassification of shares, the issuance of bands, the declaration and payment of

dividends, loans by the corporation to directors, officers and shareholders, and the purchase and

redemption by the corporation of outstanding shares of its own stock. Restatement (Second) of Conflicts of Laws § 302.

7.      Additionally, while the Court previously held that the doctrine may apply to various tort claims, a close reading of the actual trial transcripts by the Court reveals that the claims brought by Paul Albee simply do not give rise to the application of the doctrine and compels the reversal of the Court's earlier decision.  Accordingly, the claims brought by Paul Albee, individually and on behalf of AFI are hereby dismissed.[7]

### Application of Pennsylvania Law to Causes of Action Brought by All Parties

8.      District Courts sitting in Pennsylvania in diversity jurisdiction matters are generally required to apply the choice-of-law rules in the forum state.  *Michael Okpor v. Bennedetto,* C.A. No. 22-906, 2022 WL 17084125 (E.D.Pa. Nov. 18, 2022) (*citing Frankentek v. Residential Sys, LLC v. Buerger*, 15 F. Supp.3d 574, 580 (E.D. Pa. 2014)). That mandate applies to any claim that accrues within the boundaries of this District Court

### The Application of Pennsylvania's "Borrowing" Statute

9.      In the original Complaint and again in the Pretrial Memo filed on behalf of the Paul Albee Parties, it is asserted that the actions brought by any of the parties should be governed by New Jersey law despite the situs of the lawsuits (Pennsylvania). That assertion is unavailing since clearly all the complained actions occurred here in Pennsylvania. Further, Pennsylvania has enacted a "borrowing" statute that requires courts in Pennsylvania to apply the law of the

---

[7] Even if the Court does not reverse its earlier decision, the Internal Affairs Doctrine would not be applicable to White Bear Trading Company because the company is a separate entity and not involved in the internal affairs of AFI.  Therefore, the Pennsylvania Borrowing Statute as discussed below would control the claims against White Bear and the two-year statute of limitations would govern.  Accordingly, Paul's claims against White Bear are dismissed as barred by the two year statute of limitations.

foreign accrual state or the law of the forum, "whichever first bars" the asserted claims.   42

Pa.C.S.A. § 5521(b).   Section 5521 provides in relevant part:

**§ 5521. Limitations on foreign claims**
> **(b) General rule.--**The period of limitations applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim.
>
> **(c) Definition.--**As used in this section **"claim"** means any right of action which may be asserted in a civil action or proceeding and includes, but is not limited to, a right of action created by statute.

42 Pa.C.S.A. § 5521(b).

10.     Pennsylvania applies a two-year statute of limitations to each of the causes brought by or against any party to this litigation as opposed to New Jersey that extends the time to bring a claim to six years, and accordingly, Pennsylvania law must be applied in resolving all causes of actions presented by any party in this matter.

## PLAINTIFF'S CAUSES OF ACTION [8]

### Shareholder Oppression (Count I)
### Breach of Duty to a Minority Shareholder (Count II)
### Plaintiff Derivatively on Behalf of AFI for Eric's Breach of Fiduciary Duty (Count III)

11.     In Count I of his Complaint and again during the trial, Paul has averred in the most general of terms that as a shareholder "who represents the Company in enforcing and prosecuting its rights" that Eric's "vexatious conduct" caused Paul to suffer in an undescribed manner in violation of the New Jersey Minority Oppression Statute.

---

[8] In the case at hand, other than the minority oppression claim, there is no appreciable difference between the law of New Jersey and the applicable legal principles of Pennsylvania with respect to the substantive claims asserted by the respective parties.  Accordingly, even if the Internal Affairs Doctrine controls the statute of limitations applied by the Court, the substantive claims should be generally guided by the principles of law as expressed in Pennsylvania.

26

12.     In accordance with the choice of law standards stated above, the claimed New Jersey Shareholder Oppression statute and the claimed actions against Paul as a minority shareholder in AFI cannot be applied and the asserted specified relief requested of an award to Paul for financial damages, attorney fees, costs of litigation, the appointment of a custodian and the ordered purchase of Eric's Shares (presumably by Paul) in this Count must be denied.

13.     Moreover, the broadly stated allegations in Plaintiff's Complaint and the evidence adduced at trial do not support that any actions of Eric have rendered direct harm to Paul as a shareholder of AFI.

14.     In addition, while a majority shareholder under Pennsylvania law may have a duty to protect the interests of minority shareholders [*Ferber v. American Lamp Corp.,* 469 A.2d 1046, 1050 (Pa. 1983); *ARC Mfg. Co. v. Konrad,* 467 A.2d 1133, 1138 (Pa. Super. 1983); *Kessler v. Broder,* 851 A.2d 944, 947 (Pa. Super. 2004) (" It is axiomatic that majority shareholders have a duty not to use their power in such a way to exclude minority shareholder from their proper share of the benefits accruing from the enterprise")], in the present matter, Eric did not in any way deprive Paul as a minority shareholder from receiving any expected benefit.

15.     The evidence at trial was that Plaintiff  never received any direct benefit from his 46% interest in the corporation and AFI has never made distributions to its shareholders even when it generated substantial income in 2015. Therefore, Paul never had an expectation of any benefits at any time relevant to his claims.

16.     As the majority shareholder, Eric at no time took distributions and owed no greater duty to compensate Paul.

27

17.     Simply stated, Paul had no expectation of shareholder benefit from which he was deprived since no shareholder distributions have ever been made to an AFI shareholder, even when the corporation was to some small degree profitable.

18.     The very same reasoning applies to the derivative claims proffered by Paul on behalf of AFI.  Specifically, even if the action in transferring the HomeWorx project to Whitebear were to be found as a breach of duty to AFI or that Eric's letter to Chevron was not well based, Paul has not proven that those alleged breaches to the corporation would have resulted in any monetary benefit to AFI.

19.     Paul has not presented any evidence to demonstrate that AFI would have been able to realize profit from the HomeWorx project as alleged, nor has he proven that any averred relationship with Chevron could have produced a monetary benefit that AFI would have enjoyed.

20.     Finally, the non-specific allegation regarding Eric's use of the product line aroma43 or the incorporation of White Bear also has not been proven to have caused any monetary harm to AFI. There is simply no evidence produced by Paul on behalf of AFI that Whitebear directly competes with AFI in any respect or that the products advertised and sold under the long used brand name aroma43 are products that AFI manufacture or sells.

**<div align="center">Plaintiff Derivatively on Behalf of AFI<br>Against White Bear for Tortious Interference with the HomeWorx Project (Count IV)</div>**

21.     The necessary elements of cause of action for intentional tortious interference with existing contractual relationships are: (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damages as a result of defendant's

conduct. *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 962 A.2d 94 (Pa. Super 2009).

22.     For a prospective contract, Plaintiff must establish a reasonable likelihood that the relationship would have occurred but for the defendant's interference.  *Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 212 (3d Cir.2009); *Brokerage Concepts v. U.S. Healthcare Inc,* 140 F.3d 494, 530 (3d Cir. 1998) (citing *Pelagatti v. Cohen,*  536 A.2d 1337, 1343 (Pa. Super. 1988));  *See also Miffinburg Telegraph, Inc. v. Criswell,* 277 F. Supp.3d 750, 797 (M.D. Pa. 2017) (Plaintiff must only establish "an objectively reasonable probability that a contract will come into existence.").

23.     In the context of the present action, Plaintiff has not demonstrated in any fashion that WhiteBear interfered with a "contract" that existed between AFI and HomeWorx. To the contrary, the evidence of the relationship between AFI and HomeWorx was at best in the proposal stages with some work being performed to reach the stage of an enforceable contract and that no actual assurance of culminating that proposal was produced, either through the testimony of Sandra or Eric.

24.     At the time the proposal was transferred to Whitebear, other than minimal sampling, no actual work had been produced by AFI who was at the that time awaiting for HomeWorx to agree to proceed with full manufacturing of the Christmas Tree fragrance emitting bulb.

25.     Moreover, the evidence produced at trial clearly resolved that AFI was not capable of completing the tasks that HomeWorx required in a timely manner due to a lack of available resources to produce the volume requested and requirement to use a manufacturer in China which was not an option for AFI in light of their unpaid debt.

26.     Ultimately, Paul has failed to establish each of the elements necessary to prove the tort of Tortious Interference on behalf of AFI because:

- It has not proven the existence of a viable contract that could have been enforced against HomeWorx;

- It has not adequately demonstrated that White Bear had any intent to harm AFI.  The clear import of the evidence produced at trial reflects that White Bear took on the responsibility for completing a manufacturing of a product to the specifications of HomeWorx that AFI could not have undertaken;

- Knowing that AFI had no ability to satisfy the HomeWorx demands for the manufacture of the Christmas Tree Fragrance emitting ornament, White Bear was justified in having the prospective project; and

- AFI did not adequately demonstrate that it suffered actual damages by not being able to fulfill the HomeWorx requirements for the project

**Plaintiff Derivatively on Behalf of AFI Against Whitebear for Unjust Enrichment (Count V)**

27.     Unjust enrichment under Pennsylvania law is an equitable doctrine in which the law implies that a contract exists between two parties when one of those parties is found to have been unjustly enriched by the other party. *See American and Foreign Insurance Company v. Jerry's Sports Center, Inc.,* 606 Pa. 584, 594 n. 7, 2 A.3d 526, 531 n. 7 (2010).

28.     The doctrine "imposes a duty, not as a result of any agreement, whether expressed or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another."

29.     A plaintiff alleging that a defendant has been unjustly enriched bears the burden of proving that: (1) plaintiff conferred a benefit on defendant; (2) defendant appreciated the

benefit; and (3) under the circumstances, defendant's acceptance and retention of the benefit would be inequitable if defendant did not pay for the value of the benefit. *Com. v. TAP Pharmaceutical Products, Inc.,* Civ. 36 A.3d 1197 (Pa. Cmwlth. 2011); *Roethlien v. Portnoff Law Associates, Ltd.,* 25 A.3d 1274, 1278-79 (Pa. Cmwlth. 2011).

30.     In the present matter, AFI did not confer a benefit on White Bear, but White Bear is instead alleged to have tortiously stolen the opportunity. Further, the appreciation of the benefit of the HomeWorx Project was only first realized when the project was adequately concluded and could not be appreciated at the time of the transfer.  Additionally, AFI was compensated for the use of its technology.  Finally, Paul, on behalf of AFI, has not adequately demonstrated any actual benefit received by White Bear to the determinant of AFI through the presentation of any accountant or expert that could assess the value of any mandated benefit received.

## COUNTERCLAIMS AGAINST PAUL BY ERIC AND AFI

### Breach of Fiduciary Duty and Duty of Loyalty by Eric and AFI Against Paul (Count I)

31.     To establish a breach of fiduciary duty under Pennsylvania law, a plaintiff must first establish that a "fiduciary or confidential relationship existed" between two parties. *Baker v. Fam. Credit Consulting Corp.*, 440 F. Supp.2d 392, 414-415 (E.D. Pa. 2006)(discussing that this relationship exists when someone is in a position "of advisor or counselor as reasonable to inspire confidence that he will act in good faith for the other's interests").

32.     Plaintiff must also establish the elements of the a breach of fiduciary duty: "(1) [t]hat the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) [t]hat plaintiff suffered

injury; and (3) [t]he defendant's failure to act solely for the plaintiff's benefit was a real factor

bringing about the plaintiff's injuries." *Id.*

33.     Pennsylvania law further dictates that agents to a company owe that company a

duty of loyalty.  *Synthes, Inc. v. Emerge Med. Inc.,* 25 F. Supp.3d 617, 667 (E.D. Pa.

2014)(holding that an agents "specific duties of loyalty include a duty to refrain from competing

with the principal and…a duty not to use property or confidential information of the principal for

the agent's own purpose or those of a third party.").

34.     At all relevant times, a confidential relationship existed between Paul and AFI

based on Paul's role within the Company.

35.     In the present matter,  Paul breached his fiduciary duty of loyalty to Eric and AFI

by utilizing proprietary information belonging to AFI regarding nano-cellulose processes and

products and entering into personal contracts to provide services to AFAPCO/Gran Bio and other

third parties that competed with AFI while engaged with AFI.

36.     At all relevant times, AFAPCO/Gran Bio, Chevron, and the other companies

named above in the Statement of Facts actually were or should have been  customers of AFI.

37.     Paul actively engaged in diverting these customers from AFI while directly

engaged with AFI and but for Paul accepting those customers as his own, AFI would have been

the recipient of the monies stolen by Paul.

38.     As a direct result of his wrongdoing,  Paul has deprived Eric and AFI of

substantial compensation due and owing to them as well as causing AFI  the loss of Company

value, business opportunities, the advantages and opportunities of protected proprietary and trade

secrets.

**Tortious Interference with Existing and Prospective Contractual Relationships by Eric and AFI Against Paul (Count II)**

39.     To establish a tortious interference with existing or prospective contract under Pennsylvania law, a plaintiff only must show "(1) an actual or prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damages resulting from the defendant's conduct." *Perma-Liner Indus., Inc. v. U.S. Sewer & Drain, Inc.,* 630 F. Supp.2d 516, 524 (E.D. Pa. 2008).

40.     For a prospective contract, Plaintiff must establish a reasonable likelihood that the relationship would have occurred but for the defendant's interference.  *Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 212 (3d Cir.2009); *Brokerage Concepts v. U.S. Healthcare Inc,* 140 F.3d 494, 530 (3d Cir. 1998) (citing *Pelagatti v. Cohen,* 370 Pa. Super. 422, 536 A.2d 1337, 1343 (Pa.Super.Ct.1988));  *See also Miffinburg Telegraph, Inc. v. Criswell*, 277 F. Supp.3d 750, 797 (M.D. Pa. 2017) (Plaintiff must only establish "an objectively reasonable probability that a contract will come into existence.").

41.     At all times relevant hereto, AFI was deprived of entering into contractual relations with the companies that Paul undertook to do work for either directly through personal consulting or through P3n while using AFI's resources.

42.     Specifically, Paul, by and through P3n Technology, directly and purposely interfered with the contractual relationships that AFI  had with AVAPCO/Gran Bio by soliciting and entering into agreements to provide these entities with the services and products provided by AFI by using materials and processes belonging to AFI.

43.     Additionally, AFI had existing contractual relationships with SP Films and Plastics Lausa that entitled them to money for work performed.

44.     Paul, aided and abetted by Mary Ann and Sandra, directly and purposely interfered with the contractual relationships that AFI had with SP Films and Plastics Lausa by diverting the payables due to AFI into his personal bank account or accounts that he held jointly with Mary Ann and/or Sandra.

45.     In engaging in these actions, Paul acted with the intent to cause harm to AFI, without justification or privilege.

46.     As a result of the aforesaid tortious actions Paul  has been caused to suffer substantial damages in the amount of $221,350

**Embezzlement/Fraudulent Conversion Against Paul by AFI  (Count III)**

47.     Under Pennsylvania law, conversion is "the deprivation of another's right of property, use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Fenton v. Bulick*, 831 F. Supp.2d 755, 760 (E.D. Pa. 2011).

48.     Conversion can occur by "(1) acquiring possession of property with the intent to assert a right to it adverse to the owner; (2) transferring the property and therefore depriving the owner of control; (3) unreasonably withholding possession of the property from the one who has the right to it; and (4) misusing or seriously damaging the property in defiance of the owner's rights." *Id.*

49.     It is a crime under Pennsylvania law for a person to apply or dispose of property that has been entrusted to him as a fiduciary which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted.

50.     Pursuant to Pennsylvania case law, a conversion is widely understood as the deprivation of another's right of property in or use or possession of another's property or other interference therewith, without the owner's consent and without lawful justification. Restatement (2d) of Torts, §222A.

51.     A person may incur liability for conversion by unreasonably withholding possession from one who has the right to it.

52,     AFI had existing contractual relationships with SP Films and Plastics Lausa that entitled them to money for work performed.

53.     Paul, with the assistance of Mary Ann and Sandra, directly and purposely exercised control and deprived AFI  of monies owed to AFI.

54.     As a result of Paul's withholding of the payables due to AFI, the company has suffered damages including the loss of funds owed to by SP Films and Plastics Lausa.

**The Federal Defense of Trade Secrets Act ("DTSA") by AFI Against Paul (Count IV)**

55.     To state a claim under the DTSA, which has a private right of action, AFI must show "(1) they own a trade secret and (2) that the defendant misappropriated the trade secret." *Herley Indus., Inc. v. R. Cubed Eng'g, LLC*, 2021 WL 229322, at *3 (E.D. Pa. Jan. 22, 2021).

56.     DTSA defines "trade secrets" as a wide variety of information for which reasonable measures have been taken to keep [the information] secret, and which derives independent economic value from not being generally known nor readily ascertainable through proper means to others who can obtain economic value from its disclosure or use.

57.     DTSA defines "misappropriation" as the improper" acquisition, disclosure or use of such a trade secret and includes any action by persons who breach a duty of loyalty.

58.     At all times applicable to their claims, AFI took reasonable steps to keep its developed and owned novel processes secret from outside individuals and entities.

59.     AFI's process regarding the preparation of dry free-flowing nano-cellulose particulate that allows for the maximum dispersion of nano-cellulose crystals,  nano-cellulose fibers and nano-cellulose whiskers is a unique process from which AFI derives independent economic value by not being known by others.

60.     AFI expended great sums of money and time in developing this process and maintain its confidentiality including the material used.

61.     Accordingly, the process regarding the preparation of dry free-flowing nano-cellulose particulate that allows for the maximum dispersion of nano-cellulose crystals,  nano-cellulose fibers and nano-cellulose whiskers constitutes novel trade secrets under the DTSA.

62.     Paul misappropriated AFI trade secrets regarding the process of nano-cellulose dispersion including sharing formula information that he knew was developed and/or owned and protected from disclosure by AFI and sold those trade secrets personally or by and through his wholly owned corporation, P3n Technology, Inc. to AVAPCO/Gran Bio and the other entities set forth above for his own substantial economic gain.

63.     Paul misappropriated and sold those trade secrets without the consent of AFI and, in doing so, increased the profits to him personally and P3n Technology while decreasing the profits of AFI.

64.     The actions of Paul were done intentionally or with gross neglect as to evince a reckless indifference by Counterclaim Defendant Albee of AFI's rights, and an entire want of care that raises the presumption that Counterclaim Defendant was conscious of the consequences of his carelessness.

36

65.     The willful and malicious nature of  Paul's misappropriation entitles AFI to reasonable attorney's fees, expenses, and costs.

**The Pennsylvania Uniform Trade Secrets Act by AFI Against Paul (Count V)**

66.     As an alternative to the federal DTSA claim above,  misappropriation of a trade secret by an employee is actionable in a civil proceeding in the Commonwealth of Pennsylvania. *See* the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 P.S. § 5302.

67.     The Pennsylvania Uniform Trade Secrets Act defines "trade secrets" as: information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1)   Derives independent economic value, actual or potential, from not being generally known to, and not readily ascertainable by proper means by, other persons who can gain economic value for its disclosure or use  for which "reasonable measures" have been taken "to keep [the information] secret," and which "derives independent economic value . . . from not being generally known" nor "readily ascertainable through proper means" to others "who can obtain economic value from [its] disclosure or use and

(2)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

68.     The PUTSA make its unlawful to misappropriate a trade secret by an individual who had a duty to maintain its secrecy or limit its use.

69.     A complainant under PUTSA is entitled to recover damages for misappropriation including actual damages, unjust enrichment or royalties for unauthorized disclosure.

70.     Exemplary damages and attorneys' fees are available if willful and malicious misappropriation exists.

71.     The process regarding the preparation of dry free-flowing nano-cellulose particulate that allows for the maximum dispersion of nano-cellulose crystals, nano-cellulose fibers and nano-cellulose whiskers also constitutes a trade secret under the PUTSA because it is a unique method that derives independent economic value by not being known by others and AFI spends considerable time and money to protect its secrecy.

72.     Paul misappropriated AFI's trade secrets regarding the process of nano-cellulose dispersion including sharing formula information that he knew was developed and/or owned and protected from disclosure by AFI and sold those trade secrets personally or by and through his wholly owned corporation, P3n Technology, Inc. to ACAPCO/Gran Bio for his own substantial economic gain.

73.     The aforesaid misappropriation by Paul, a fiduciary of AFI, was made in bad faith and for his personal economic gain without authorization by the Company.

74.     The aforesaid actions of Paul were taken while he was a fiduciary of AFI, were willful and malicious and were affected as part of a pattern and practice by him throughout his relationship with the Company as a fiduciary, up to and including the present time.

75.     Paul misappropriated and sold the aforementioned trade secrets without the consent of AFI and, in doing so, increased the profits of Paul Albee and P3n Technology while decreasing the profits of AFI.

**Corporate Dissolution Brought By Eric (Count VI)**

76.     In accordance with the provisions of 15 Pa.C.S.A. §1981, at the request of a shareholder, a court can order the dissolution of a corporation if the acts of individuals in control of the corporation are illegal or fraudulent, corporate assets are being misapplied, and it is

beneficial to the interests of the innocent shareholders that the corporation be wound up and dissolved.  The statute provides in pertinent part:

**§ 1981. Proceedings upon application of shareholder or director.**

**(a) General rule. --** Upon application filed by a shareholder or director of a business corporation, the court may entertain proceedings for the involuntary winding up and dissolution of the corporation when any one of the following is made to appear:

(1) The acts of the directors, or those in control of the corporation, are illegal, oppressive or fraudulent and that it is beneficial to the interests of the shareholders that the corporation be wound up and dissolved.

(2) The corporate assets are being misapplied or wasted and that it is beneficial to the interests of the shareholders that the corporation be wound up and dissolved.

77.     As reflected in the above allegations, the wrongful and illegal actions of shareholder Paul Albee while he involved with the Company including his actions in purposely interfering with the contractual relationships that AFI had with other entities by soliciting and entering into agreements to provide these entities with the services and products provided by AFI by using materials and processes belonging to AFI and his fraudulent actions in so doing combined with his diverting funds of the Company require that Paul Albee be removed as the operating shareholder of AFI and that the Company be dissolved.

78.     Paul Albee engaged in these oppressive actions and wasted corporate assets by diverting funds and sharing proprietary information with AFI customers for his own personal gain occurred while he was in a position of control at AFI.

79.     More significantly, the evidence at trial demonstrates that this is a failing company that is financially defunct.

80.     Paul Albee is refusing to dissolve AFI solely so he can continue operating his other separately owned business.

81.     It is in the best interests of both Paul and Eric for AFI to be dissolved.

**THIRD PARTY CLAIMS**

**Aiding and Abetting the Breaches of Duty by Paul Albee Brought by Eric and AFI Against Mary Ann and  Sandra (Count I)**

82.     Courts in Pennsylvania "have repeatedly relied on § 876 in civil claims for aiding and abetting claims." *See Linde v. Linde*, 220 A.3d 1119, 1145 (Pa. Super. Ct. 2019) (applying § 876 to claim against company directors for aiding and abetting majority shareholder's breach of his fiduciary duty to a minority shareholder); *HRANEC Sheet Metal, Inc. v. Matlico Pittsburgh, Inc.*, 107 A.3d 114, 120 (Pa. Super. Ct. 2014) (holding that "a concerted tortious conduct claim [under § 876] is a viable cause of action in Pennsylvania"); *Sovereign Bank v. Valentino*, 914 A.2d 415, 427 (Pa. Super. Ct. 2006) ("Based upon the foregoing, we hold that concerted tortious action, as defined in Section 876 of the Restatement (Second) of Torts, is a recognized civil cause of action under Pennsylvania law.").

83.     As contained in the comments to § 876(b), the Court may consider the following factors in determining whether substantial assistance has been provided for purposes of aiding and abetting: the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other, and his state of mind.

84.     Mary Ann and Sandra knowingly permitted Paul to divert funds due and owing to AFI and placed those funds in jointly held accounts for the use by Paul and Mary Ann and Sandra.

85.     Sandra also wrongful removed funds from the Company to pay for personal items

86.     Mary Ann and Sandra engaged in with, enabled, aided, and abetted the wrongful actions of Paul Albee throughout the term of his engagement with the Company for his own interests apart from those of Eric Albee and AFI. *See* Restatement (Second) of Agency § 394

40

87.     Mary Ann and Sandra also engaged in their own wrongful actions and knowingly enabled and aided and abetted Paul to breach his fiduciary duty of loyalty to Eric and AFI by entering into personal contracts with Company's customers to provide competing services and diverted customers while he directly controlled, was employed with and was compensated by the Company.

88.     As a direct result of this wrongdoing, Mary Ann and Sandra have aided and abetted Paul Albee to deprive Eric Albee and AFI of substantial compensation due and owing to them.

## Tortious Interference with Existing and prospective Contractual Relationships brought by AFI Against Mary Ann and Sandra (Count II)

89.     At all times relevant hereto, AFI had existing contractual relationships with SP Films and Plastics that entitled them to money for work performed.

90.     Sandra and Mary Ann knew about these contractual relationships.

91.     Paul, with the assistance and aid of Mary Ann and Sandra, directly and purposely interfered with the contractual relationships that AFI had with SP Films and Plastiques by diverting the payables due to AFI into his personal bank account or accounts that he held jointly with Mary Ann and/or Sandra.

92.     In engaging in these actions, Sandra and Mary Ann acted with the intent to cause harm to AFI, without justification or privilege.

93.     As a result of the aforesaid tortious actions by Mary Ann and Sandra, AFI has been caused to suffer substantial damages including but not limited the loss of funds owed to them by SP Films and Plastics.

**Embezzlement/Fraudulent Conversion Against Sandra and MaryAnn by AFI (Count III)**

94.     Sandra and Mary Ann embezzled, converted and made use of those Company funds and that property for their individual and collective personal gain, all to the detriment of AFI.

95.     AFI had existing contractual relationships with SP Films and Plastics that entitled them to money for work performed.

96.     Mary Ann and Sandra, together with Paul directly and purposely exercised control and knowingly deprived AFI of the funds owed to it by SP Films and Plastiques by diverting the payables belonging to AFI into his personal bank account or accounts that he held jointly with Mary Ann and/or Sandra.

97.     As a result of Mary Ann's and Sandra's actions in aiding and abetting Paul's actions in withholding of the payables due to AFI, AFI has suffered damages including the loss of funds owed to them by SP Films and Plastiques.

**The Federal Defense of Trade Secrets Act ("DTSA") by AFI Against P3n (Count IV)**
**The Pennsylvania Uniform Trade Secrets Act by AFI Against P3n(Count V)**
**The Federal Defense of Trade Secrets Act ("DTSA") by AFI Against Paul (Count IV)**

98.     To state a claim under the DTSA, which has a private right of action, AFI must show "(1) they own a trade secret and (2) that the defendant misappropriated the trade secret." *Herley Indus., Inc. v. R. Cubed Eng'g, LLC*, 2021 WL 229322, at *3 (E.D. Pa. Jan. 22, 2021).

99.     DTSA defines "trade secrets" as a wide variety of information for which reasonable measures have been taken to keep [the information] secret, and which derives independent economic value from not being generally known nor readily ascertainable through proper means to others who can obtain economic value from its disclosure or use.

100.    DTSA defines "misappropriation" as the improper" acquisition, disclosure or use of such a trade secret and includes any action by persons who breach a duty of loyalty.

101.    At all times applicable to their claims, AFI took reasonable steps to keep its developed and owned novel processes secret from outside individuals and entities.

102.    AFI's process regarding the preparation of dry free-flowing nano-cellulose particulate that allows for the maximum dispersion of nano-cellulose crystals,  nano-cellulose fibers and nano-cellulose whiskers is a unique process from which AFI derives independent economic value by not being known by others.

103.    AFI expended great sums of money and time in developing this process and maintain its confidentiality including the material used.

104.    Accordingly, the process regarding the preparation of dry free-flowing nano-cellulose particulate that allows for the maximum dispersion of nano-cellulose crystals,  nano-cellulose fibers and nano-cellulose whiskers constitutes novel trade secrets under the DTSA.

105     Paul misappropriated AFI's trade secrets regarding the process of nano-cellulose dispersion including sharing formula information that he knew was developed and/or owned and protected from disclosure by AFI and sold those trade secrets personally or by and through his wholly owned corporation, P3n Technology, Inc. to ACAPCO/Gran Bio for his own substantial economic gain.

106.    Paul misappropriated and sold those trade secrets without the consent of AFI and, in doing so, increased the profits of Paul Albee and P3n Technology while decreasing the profits of Aromatic AFI.

107.    The actions of Paul were done intentionally or with gross neglect as to evince a reckless indifference by Paul of AFI's rights, and an entire want of care that raises the presumption that Paul was conscious of the consequences of his carelessness.

108.    The willful and malicious nature of Paul's misappropriation entitles Eric Albee and AFI to reasonable attorney's fees, expenses, and costs.

**The Pennsylvania Uniform Trade Secrets Act by AFI Against Paul (Count V)**

109.    As an alternative to the federal DTSA claim above,  misappropriation of a trade secret by an employee is actionable in a civil proceeding in the Commonwealth of Pennsylvania. *See* the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 P.S. § 5302.

110.    The Pennsylvania Uniform Trade Secrets Act defines "trade secrets" as: information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1)   Derives independent economic value, actual or potential, from not being generally known to, and not readily ascertainable by proper means by, other persons who can gain economic value for its disclosure or use  for which "reasonable measures" have been taken "to keep [the information] secret," and which "derives independent economic value . . . from not being generally known" nor "readily ascertainable through proper means" to others "who can obtain economic value from [its] disclosure or use and

(2)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

111.    The PUTSA make its unlawful to misappropriate a trade secret by an individual who has a duty to maintain its secrecy or limit its use.

112.    A complainant under PUTSA is entitled to recover damages for misappropriation including actual damages, unjust enrichment or royalties for unauthorized disclosure.

113.    Exemplary damages and attorneys' fees are available if willful and malicious misappropriation exists.

114.    The process regarding the preparation of dry free-flowing nano-cellulose particulate that allows for the maximum dispersion of nano-cellulose crystals, nano-cellulose fibers and nano-cellulose whiskers also constitutes a trade secret under the PUTSA because it is a unique method that derives independent economic value by not being known by others and AFI spends considerable time and money to protect its secrecy.

115.    Paul misappropriated AFI's trade secrets regarding the process of nano-cellulose dispersion including sharing formula information that he knew was developed and/or owned and protected from disclosure by AFI and sold those trade secrets personally or by and through his wholly owned corporation, P3n Technology, Inc. to ACAPCO/Gran Bio for his own substantial economic gain.

116.    The aforesaid misappropriation by Paul was made by a fiduciary of AFI in bad faith and for his personal economic gain without authorization by the Company.

117.    The aforesaid actions of Paul were taken while he was a fiduciary of AFI, were willful and malicious and were affected as part of a pattern and practice by him throughout his relationship with the Company as a fiduciary, up to and including the present time.

118.    Paul misappropriated and sold the aforementioned trade secrets without the consent of AFI and, in doing so, increased the profits to him personally and P3n Technology while decreasing the profits of AFI.

## DAMAGES

119.    The total known and quantifiable  monetary damages suffered by Eric and AFI as evidenced above are as follows:

- Damages related to the receipt by Paul Albee and P3n with the aid of Sandra and Mary Ann from AVAPCO Grand Bio, Millikin, SP Films and Trigon - $221,350

- Damages relating to the embezzlement by Sandra - $683,000

120.    Additionally, Eric and AFI are entitled to an award of punitive damages based upon the willful and outrageous conduct of Paul, Sandra and Mary Ann and Eric and AFI are entitled to an award of attorneys fees pursuant to the state and federal trade secrets statutes.

121.    Further, based upon his wrongdoing as aforesaid, Paul must be disqualified from sharing in any damages assessed against him and in favor of AFI as a matter of law.

122.     The damages suffered by Paul are not ascertainable because he produced no expert testimony or basis to calculate the losses AFI suffered in connection with the HomeWorx project.

123.    Since damages are not to be presumed, they must be fixed with a reasonable degree of certainty.  *E.g., Friedman v. Parkway Baking Co.,* 524 A.2d 157 (Pa. Super. 1942).

124.    The fact-finder must be given an adequate framework upon which to base a verdict.

> "[D]amages may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation.  Sufficient evidence must be produced to permit a reasonably certain estimate of the amount of anticipated profits lost due to the breach."  [Citation omitted]

*Jahanshahi v. Centura Dev. Co., Inc*., 816 A.2d 1179, 1184 (Pa. Super. 2003).

125.    In the instant matter, Paul provided no basis to calculate the anticipated profits he claims that AFI lost.

**SPECTOR GADON ROSEN VINCI P.C.**

By:   /s/ *Alan B. Epstein*

Alan B Epstein, Esquire (Pa. No. 2346)
Jennifer M. Chalal, Esquire (Pa. No. 77841)
1635 Market Street, 7th Floor
Philadelphia, PA 19103
*Attorneys for Eric Albee, Whitebear Trading
and AFI*

Dated:  September 5,  2023

## <u>CERTIFICATE OF SERVICE</u>

I, Alan B. Epstein, Esquire, hereby certify that the foregoing Proposed Findings of Fact and Conclusions of Law was served this <u>5 </u>day of September, 2023 v*ia* ECF upon the following:

Steven C. Goldblum, Esquire
2617 Huntingdon Pike
Huntingdon Valley, PA  19006

*Attorneys for Plaintiff Paul Albee and Third Party Defendants Mary Ann Albee, Sandra Albee Keely and P3N*

/s/ Jennifer M. Chalal
Jennifer M. Chalal