IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL ALBEE, individually and derivatively on behalf of Aromatic Fusion, Inc. | : : : | CIVIL ACTION |
| v. | : | NO. 21-3984 |
| ERIC ALBEE and WHITE BEAR TRADING COMPANY and AROMATIC FUSION, INC. | : : : | |

| | | |
|---|---|---|
| AROMATIC FUSION, INC. and ERIC ALBEE | : : | |
| v. | : : | |
| MARY ANN ALBEE, SANDRA ALBEE KEELEY and P3n TECHNOLOGY, INC. | : : | |

## MEMORANDUM

**Chief Judge Juan R. Sánchez**                                    **February 14, 2024**

This is a shareholder derivative action initiated by Paul Albee, the minority shareholder in a family business, against his son Eric, the business's majority and only other shareholder, and White Bear Trading Company, for usurpation of corporate opportunity, tortious interference with existing and prospective contractual relations, breach of fiduciary duty and unjust enrichment. In response, Eric Albee filed counterclaims against his father and a Third Party Complaint against his mother, Mary Ann Albee and his sister, Sandra Albee Keeley, raising the same and other, similar claims. Following a non-jury trial and in accordance with the following factual findings, the Court shall enter judgment in favor of Paul Albee individually and derivatively on behalf of Aromatic Fusion, Inc. against Eric Albee and White Bear Trading Company on the Complaint, and in favor of Paul Albee, Mary Ann Albee, Sandra Albee Keeley and P3N Technology, Inc. against Eric Albee and Aromatic Fusion, Inc. on the Counterclaim/Third-Party Complaint.

1

**FINDINGS OF FACT**

1.    Plaintiff Paul Albee is an adult individual residing at 409 Sergeant Drive, Lambertville, New Jersey 08530.  Compl. ¶ 2, ECF No. 1; Def.'s Ans. ¶ 2, ECF No. 18.

2.    Defendant Eric Albee is an adult individual residing at 640 NW 28th Court, Wilton Manors, FL 33311.    Compl. ¶ 3; Ans. ¶ 3.

3.    Aromatic Fusion is a corporation organized and existing under the laws of the State of New Jersey with its only place of business at 3185 Tucker Road, Bensalem, Pennsylvania 19020. Compl. ¶ 6; Ans. ¶ 6.

4.    Aromatic Fusion Inc. ("AFI") was incorporated and registered with the State of New Jersey on March 5, 2003 by Eric Albee and Sandra Albee Keeley, each of whom owned 50% of the corporation and were identified as officers and directors of AFI.  N.T. 6/12/23, 54-56, 62-63; Ex. 1.  Eric Albee was identified as AFI's President, and Sandra Albee Keeley was identified as the Treasurer and Secretary. *Id*. at 57-58; Ex. 40.

5.    AFI is in the business of developing and supplying fragrances, air care products and air neutralizers, additives and modifiers for plastics, and additive concentrates.   Second Am. Counterclaim of Eric Albee  ¶ 8, ECF No. 35; Ans. of Paul Albee to Second Am. Counterclaim ¶ 8, ECF No. 36; N.T. 6/12/23, 53.

6.    Paul Albee is the father of Eric Albee and Sandra Albee Keeley.  Mary Ann Albee is the wife of Paul Albee and the mother of Eric Albee and Sandra Albee Keeley.  Second Am. Counterclaim of Eric Albee  ¶ 15; N.T. 6/12/23, 49-51; N.T. 6/13/23, 114-115.

7.    White Bear Trading Company ("White Bear") is a limited liability company organized and existing under the laws of the State of Florida.  White Bear was registered with the State of

Florida on October 24, 2016, at which time its address was 6971 North Federal Highway 400, Boca Raton, FL 33487.  Compl. ¶ 4; Ans. ¶ 4; N.T. 6/13/23, 120; Ex. 4.

8.    The principals/owners of White Bear are Eric Albee and Ryan Willits, a Florida attorney. Eric Albee owns 60% of White Bear and Ryan Willits owns 40%.  N.T. 6/13/23, 121-122; Ex. 4. White Bear's business focuses on facilitating the production of something which another person or entity asks it to produce – it does little work developing its own new products.  Included among the types of products White Bear assists in producing and selling are products which disburse fragrances.  N.T. 6/13/23, 122-23.

9.    Much of the initial work to launch AFI consisted of soaking fragment material in fragranced oil, and Eric Albee did most of this work himself in his basement until AFI moved to its Bensalem, Pennsylvania location.  N.T. 6/12/23, 70-71; N.T.6/14/23, 16.  AFI's first customers were EES, Aroma Terra, and Liz Claibourne.  While Eric Albee handled the soaking processes and marketing, Sandra Keeley took orders and shipped bags.  N.T. 6/12/23, 70-71; N.T. 6/14/23, 17-18.

10.    Whereas AFI primarily handled fragrances, fragrance delivery systems, and fragranced pellets, over time it also developed an "additive" side to its business, focused on the development of additive concentrates for the plastics industry which help process plastics better thereby making them lighter and less costly.  N.T. 6/12/23, 101-103, 193. Although there was no separation in the company's books and records between the two, the "additive side" of AFI often did business as "Addisperse."  *Id*.

11.    The additive side is distinct and different from the fragrance side of AFI's business. N.T. 6/12/23, 192.  The raw materials and buying of raw materials, the processing, and customer bases are completely different, and most of the products on the additive side are handled "in-

house."  On the other hand, because the fragrance products were often injection molded, AFI would have to outsource some or all the manufacturing for its fragrance-side products.  *Id.* 192-193, 196-199.  Eric Albee was focused primarily on generating business and developing sales for the fragrance side of AFI.  Paul Albee, who had a bachelor's degree in chemistry from Drexel University and spent most of his career in the chemical polymer industry, focused his energies on research, development, and business generation for the additive side.  *Id.*; N.T. 6/14/23, 145.

12.  Throughout AFI's history, its officers, directors, and/or shareholders (Eric Albee, Sandra Albee Keeley, and Paul Albee) did not have formal meetings, although they would talk about business over coffee.  N.T. 6/12/23, 57.  From time to time, some corporate formalities were observed, such as taking minutes, passing corporate resolutions, amending bylaws, and adding the resulting documents to AFI's minute book.  *Id.* at 57-62, 69-70.  Updating the minute book was a joint responsibility shared by Eric Albee and Sandra Keeley.  *Id.*

13.  In 2009, AFI began selling a product called the "Scentbug," a battery-operated, egg-shaped device with a drawer into which a fragrance medium was placed, and a fan which pulled air past the fragrance and diffused it into the air.  N.T. 6/12/23, 72; N.T. 6/13/23, 129; N.T. 6/14/23, 50-51.  There were several variations of the Scentbug, and it was sold in different shapes like turtles, animals, or snowmen.  The product was developed by AFI for, and sold by, Bath and Body Works; the various shapes were designed by Wealthy Lane, a company in Hong Kong, and manufactured in China.  N.T. 6/13/23, 129-130.  In 2009, the Scentbug resulted in significant orders for AFI, one of which was for $2.5 million.  N.T. 6/12/23, 71-76.

14.  In 2008 and 2009, when the Scentbug opportunity was first offered, AFI did not have the capital or financing in place to take on the project.  N.T. 6/12/23, 82; N.T. 6/13/23, 132-134.  Despite having the promise of significant orders from Bath & Body Works, AFI's bank refused to

4

provide the financing needed to support the project, so AFI worked instead with a company which agreed to provide financing in exchange for AFI selling it some of its receivables.  N.T. 6/12/23, 82-83.

15.  In 2009, AFI had $4,036,245 in sales, and in 2010, its sales totaled $5,242,246.  Ex. 25. In March 2010, AFI secured two $250,000 lines of credit with Univest Bank to help fund its efforts to develop a solid gel for use in producing car air fresheners and other scented products.  N.T. 6/14/23, 26-27.  Because Sandra Keeley did not have good credit and was unwilling to sign as a guarantor, she relinquished 42% of her shares in AFI to Paul Albee so he could co-guarantee the loan with Eric.  N.T. 6/12/23, 61-62; N.T. 6/14/23, 27-28.  Thereafter, Eric Albee became the majority shareholder of AFI with his 50% ownership interest, Paul Albee owned 42%, and Sandra Keeley owned 8% of the company.  6/12/23, 61-62; Ex. 33.

16.  Harry Slatkin was an employee of Bath and Body Works who was also affiliated with a separate entity, Slatkin & Company, through whom Bath and Body Works branded the Scentbug pursuant to a contract.  *Id.* at 73.  Charles Ye was AFI's primary contact at Wealthy Lane, and Mr. Hong was the primary contact with Yong Zin Plastic and Metal Hardware, the Chinese company which manufactured the product.  Due to language barriers, Charles Ye usually handled the communications and interactions with Mr. Hong on behalf of AFI and Slatkin.  *Id.* 75-78; N.T. 6/13/23, 130.  There were several meetings at AFI's Bensalem location between Eric Albee, Paul Albee, Sandra Keeley and both Hong and Ye.  N.T. 6/12/23, 78; N.T. 6/13/23, 130-131.

17. Sales of the Scentbug began dwindling in 2011, and at or around this same time, Bath and Body Works parted ways with Harry Slatkin.  N.T. 6/13/23, 89-90, 134; N.T. 6/14/23, 22. Thereafter, the Scentbug was branded only under the Slatkin and Company name, and Bath & Body Works dropped it from its product line.  N.T. 6/12/23, 73, 81-82; N.T. 6/13/23, 134.

5

18.  In 2011, AFI's annual sales totaled $1,904,115, and in 2012 and 2013, its annual sales declined to slightly more than $1.1 million in each year.  N.T. 6/12/23, 80-82; Ex. 25.  In 2014, AFI's annual sales dropped below $1 million and its sales continued to decline in the following years.  In 2019, AFI's sales totaled just $472,718.  Ex. 25.  The Albees attributed much of the decline to Bath & Body Works having eliminated the Scentbug from their product line when they separated from Harry Slatkin and Slatkin & Company.  N.T. 6/12/23, 82; 6/14/23, 30.

19.   AFI's first line of credit was eventually converted to a small business loan and paid off.  *Id.* at 27.  The second line of credit was initially secured by Eric Albee and his then-husband's property in New Jersey.  N.T. 6/13/23, 195.  In 2014, however, Eric Albee divorced, sold the property securing the loan, and moved to Florida.  N.T. 6/14/23, 160-161.  Because Univest refused to use Eric Albee's property in Florida as collateral to secure the credit lines, Paul and Mary Ann Albee agreed to guarantee and secure the loan with their residence in Lambertville, New Jersey.  N.T. 6/13/23, 195-196; N.T. 6/14/23, 28.

20.  Among Eric Albee's responsibilities as President of AFI was sales and business generation.  N.T. 6/14/23, 159-160.  In 2014, Eric Albee had been expending less effort with respect to generating new business and making sales on behalf of AFI, but he and his father nevertheless agreed he could split his time between Florida and AFI's Bensalem location after he moved, so long as he would also continue to make sales calls and develop AFI's business when he was in Florida.  *Id.* at 160-161; N.T. 6/12/23, 48.

21.  Despite his assurances to his father, Eric Albee became more and more disengaged from the business of AFI after he relocated, and his trips to Pennsylvania became less and less frequent.  N.T. 6/12/23, 47-48; N.T. 6/14/23, 161-162.  On those occasions when he did come to Bensalem to work, he spent most of his time behind his closed office door, interacted less with other AFI

officers and employees, generated fewer sales, and developed fewer business opportunities.  N.T. 6/12/23, 103-104; 6/14/23, 161-162.

22.  In 2016, after Harry Slatkin's non-compete period following his separation from Bath & Body Works expired and he was able to start developing his own products, AFI became involved in development work on a Slatkin project known as "HomeWorx."  N.T. 6/12/23, 83-84; N.T. 6/13/23, 134-136.  Specifically, AFI began working with fragrances and gel material and doing design work on a little gel disc to be used in warmers, and a battery-operated pillar candle with fan.  N.T. 6/12/23, 84; 6/13/23, 136.  Slatkin incorporated HomeWorx LLC in 2016 and it became the entity taking and issuing orders and paying invoices in conjunction with the project. HomeWorx LLC anticipated selling its products through the QVC home shopping network.  N.T. 6/12/23, 84-85; N.T. 6/13/23, 135-137; N.T. 6/14/23, 53-54; Exs. 3, 5.

23.  Several product ideas and concepts were discussed with Harry Slatkin for the HomeWorx/QVC project(s).  Among these were an ornament like the Scentbug that could be hung on a tree but utilized the little gel discs instead of a pad with scented oil, a small floral petal molded piece, a flameless candle, a little ball with a hook on top with a fan-based device, and a cube diffuser.  N.T. 6/14/23, 53-59.  Nearly all these product concepts were revived and/or revisited ideas and designs which AFI had previously done for other customers, including Bath & Body Works.  *Id*.; N.T. 6/12/23, 89-93; Exs. 6, 8, 9, 10.

24.  Although AFI originally hoped to be able to produce its products for HomeWorx in the United States, because of the anticipated volume of products that would be needed to fill orders, AFI and HomeWorx agreed that manufacturing would be done in China using the same factory (Hong's) previously used for the Scentbug.  Again, Charles Ye and Wealthy Lane would operate as intermediary between AFI and the factory.  6/12/23, 93-96, 197-203; N.T. 6/14/23, 60.

25.  On December 16, 2016, Eric Albee forwarded to Sandra Keeley an email he had received from HomeWorx representative Jimmy Lefevre which had been sent to Eric's personal Gmail account attaching a "Vendor Set Up Form" for completion.  Lefevere stated, "in order to receive orders from QVC," AFI "had to be set up as a supplier" with HomeWorx LLC.  N.T. 6/12/23, 85; N.T. 6/13/23, 141-142; Ex. 5.  On December 22, 2016, in response to Lefevere's request, Sandra Keeley prepared the form for AFI which named Eric Albee as the contact for AFI and listed Eric's office and mobile telephone numbers and his AFI email, ealbee@afi-global.com. Sandra's email, skeeley@afi-global.com was listed as the "finance email address."  N.T. 6/12/23, 86-88; N.T. 6/13/23, 142-143; Ex. 13.

26.  Additionally, the Vendor Set Up Form identified the factory that would be doing the manufacturing of the products for HomeWorx, and provided the payment terms: a 30% deposit with 70% due upon shipping.  This meant the customer would be making a 30% deposit with AFI, and AFI would pay that money to Wealthy Lane who would then work with the factory to have the products made.  6/12/23, 86-88, 94-95; N.T. 6/13/23, 142-143; Ex. 13.

27.  By the time the discussions concerning where the manufacturing would be done took place, nearly all work for the HomeWorx project had been completed by AFI, and the only thing left was for final orders to be placed.  N.T. 6/12/23, 86-95, 196-203; N.T. 6/13/23, 144-151; N.T. 6/14/23, 185-189; Exs. 6, 8, 9, 13.  However, AFI didn't have the financing needed to put down the 30% deposit required by the factory before it would begin manufacturing.  N.T. 6/12/23, 97, 203-205; N.T. 6/14/23, 60-61.  AFI also still owed the factory a receivable from having it manufacture fragrance cubes created for Menards, a company in the Midwest which then failed to order them.  *Id.*  This resulted in the cubes sitting on AFI's shelves for years.  N.T. 6/12/23, 95-98. Following a meeting at AFI at which Sandra Keeley, Eric and Paul Albee, Charles Ye and Mr.

Hong were all present, it was decided to write off the receivable as the cubes were no longer saleable. *Id*. at 99-100.

28. Despite the receivable, AFI had no difficulty doing business with the Hong factory in China and having it do the manufacturing needed to fill its orders on other jobs with Gold Canyon International and Air Essentials. N.T. 6/12/23, 157-163; N.T. 6/13/23, 86-88; N.T. 6/20/23, 12.

29. Notwithstanding the write-off of the receivable owed to the Hong factory, both Eric Albee and Sandra Keeley recognized that AFI nevertheless needed to secure an additional source of capital or financing for the company. N.T. 6/12/23, 99-100; N.T. 6/14/23, 60-61. Although Sandra Keeley suggested they pursue the same or similar arrangement as they had used to first obtain capital to move forward on the Scentbug project, Eric Albee rejected her suggestion outright and refused to discuss it, because "they won't accept that." N.T. 6/12/23, 100-101. At no time did Eric Albee pursue or seek out financing on behalf of AFI for the HomeWorx project. *Id*.; N.T. 6/13/23, 170-171.

30. Instead, in or around March 2017, Eric Albee unilaterally decided to "transfer" the HomeWorx project from AFI to White Bear Trading Company, because he believed "it was the best way to save a project to keep it moving forward." N.T. 6/13/23, 152, 160; N.T. 6/14/23, 62. Prior to transferring the project, Eric Albee never informed or discussed his decision with Sandra, Paul, or anyone else at AFI. N.T. 6/13/23, 100, 105, 109, 152-154, 171-172; N.T. 6/14/23, 62-63, 192-194.

31. Eric Albee represented to Homeworx that there existed a "shared technology agreement" between White Bear and AFI. N.T. 6/13/23, 152-154; Ex. 11. This "shared technology agreement" apparently arose in response to a request from HomeWorx, was never written, and Eric Albee never discussed it with either Sandra Keeley, Paul Albee, or anyone else at AFI prior

to or after he entered it on behalf of both AFI and White Bear.  *Id.*; N.T. 6/12/23, 108-109, 208-209; 6/13/23, 79-80, 161-163; 6/14/23, 195; Ex. 16.

32.  On March 17, 2017, Eric Albee sent an email using his personal Gmail account to Yvonne Franco at HomeWorx responding to her request for "a note regarding the transfer of the HS HomeWorx orders from Aromatic Fusion to White Bear Trading Co., LLC." Ex. 11.  In the email, Eric explained that while he initially intended to do the work on this project at Aromatic Fusion, his "production facility in Pennsylvania,"

> [d]ue to the tight time requirements of this program, there was a need to change production to China based manufacturing which involves a different level of logistics, coordination, financial management, funding and manpower.  This work is managed by White Bear Trading Co., LLC with our team in Boca Raton, FL for legal, finance, management and main office, along with our team in Hong Kong for product development, engineering, manufacturing management and logistics coordination with partner factories in China.  Since this transfer, Jimmy has had the chance to visit the factory in China, as well as work directly with Charles from our team in Hong Kong, in order to accelerate the project.  The additional resources available with White Bear Trading Co., LLC were needed to accomplish this program both with manpower and financially as there was a significant investment needed of both to finish development of the products, create gel melt tooling, prototype building, engineering and sample production labor, etc. …
>
> As these are two separate companies, I have structured a shared technology arrangement between the two companies and I will coordinate this internally through our normal internal channels.  At this point any contact regarding placement of purchase orders, as well as any contact regarding these projects should go exclusively through White Bear Trading Co., LLC for management, and we will coordinate details internally through the partner companies involved.  . . .

*Id.*; N.T. 6/13/23, 152-154.

33.  After March 2017, AFI received no more work from HomeWorx.  As per Eric Albee's instructions, HomeWorx removed AFI and substituted White Bear Trading Co. as a vendor on its paperwork, and all purchase orders and all payments were thereafter sent to White Bear instead of AFI.  N.T. 6/12/23, 203-205; 6/13/23, 86, 173-183; N.T. 6/14/23, 187-189; Exs. 12, 14.

34. Although he acknowledged the "shared technology agreement" was never reduced to writing, Eric Albee testified it provided for the payment of a flat fee by White Bear to AFI, initially in the amount of $30,000.  N.T. 6/13/23, 154, 161-162.  However, because the project got larger, the fee was subsequently increased to $50,000.  *Id.*  Purportedly, the fee was compensation for use of AFI's technology and its preparation of product samples.  *Id.* at 163.  The fee was not required to be paid by a date certain nor did the agreement permit AFI to perform an accounting of the sales that resulted from the use of its technology and samples to determine how the amount of the fee was calculated.  *Id.*  AFI has never had a shared technology or licensing agreement with any other company pursuant to which it would be paid royalties.  N.T. 6/12/23, 206; N.T. 6/13/23, 79-80; N.T. 6/14/23, 195-196.

35. On March 21, 2017, Paul Albee underwent heart bypass surgery and was unable to work for several months afterward.  N.T. 6/12/23, 46-47, 130-131; 6/13/23, 183-184, 6/14/23, 167-168, 189-190.  While Paul was out, Eric Albee decided to investigate what was causing AFI's financial difficulty.  N.T. 6/14/23, 30-31.  In doing so, Eric found bank statements reflecting payments to the mortgage company holding Sandra Keeley's mortgage and to her personal Best Buy credit card, as well as various direct funds transfers to her personal bank accounts, totaling approximately $683,000.  *Id.* at 32.  When Paul Albee returned to part-time work in mid-June 2017, Eric discussed his findings with him.  The day after Paul's return, he and Eric confronted Sandra and asked for her resignation.  *Id.*, 32-33, 169-176; N.T. 6/12/23, 46-48.

36. On June 19, 2017, Sandra Keeley resigned her position(s) with AFI.  Pursuant to a corporate resolution entered June 20, 2017, Sandra transferred her remaining interest in AFI to Paul Albee and Eric Albee in equal parts and agreed she would "no longer be involved in any of AFI's operations, financial or otherwise, or other related businesses of dba's."  N.T. 6/12/23, 64-

69, 130; Exs. 33, 34, 35.  Eric Albee thus became the owner of 54% of the shares of AFI and Paul Albee the owner of 46%.  N.T. 6/13/23, 126-127.

37.  Although Sandra Keeley did not defend herself from Eric Albee's accusations during the June 2017 meeting, she was happy to resign because she felt she was working too much as the result of Eric's move to Florida, and no longer wanted to be in business with him.  N.T. 6/12/23, 46-50; N.T. 6/14/23, 174.  Following her resignation, Sandra continued to work for AFI until Diane Aiello, the new office manager/bookkeeper, who was hired in late June 2017 could be trained and the company's books and records moved from the Peachtree accounting system to QuickBooks. N.T. 6/13/23, 60-63, 67-68; N.T. 6/14/23, 176.  During this time, Sandra produced and reviewed financial spreadsheets from 2015 – 2017 with Paul which showed that while she did wrongfully pay for some personal expenses using company funds, most of the checks made payable to her, and to her mother, Mary Ann Albee, were repayment for bridge loans they made to the company until funds came in from receivables, and for cash to pay the employees.  N.T. 6/12/23, 48-49; N.T. 6/14/23, 176-178.  When Sandra and Paul tried to present the supporting documentation to Eric, he refused to look at or discuss it, and continues to believe Sandra Keeley stole nearly $700,000 from AFI.  N.T. 6/12/23, 48-49; N.T. 6/13/23, 204; N.T. 6/14/23, 177-179; Ex. 7.

38.  Between 2017 and 2019, with AFI's sales and revenues continuing to fall due to the ongoing reduction in Scentbug sales and a tighter, declining marketplace, AFI was forced to use its credit line more frequently to meet payroll and pay operating expenses.  N.T. 6/14/23, 30-31.

39.  On October 18, 2017, AFI received a $50,000 wire transfer to its TD bank account from "Willits & Associates, P.A. Florida IOTA Trust Account."  Under the heading "Payment Details," the fax transmittal cover sheet and letter notification from TD Bank stated only "Royalty Payment for Gellebos."  N.T. 6/13/23, 76-78; Ex. 16.  Because Eric Albee had not told anyone at AFI about

the shared technology agreement, no one at AFI knew what the wire transfer was for or why it was sent.  N.T. 6/12/23, 205-206; N.T. 6/13/23, 50.  When AFI's production manager AJ Campione and Diane Aiello asked Eric what the $50,000 transfer was for, he refused to explain and just said it had to do with sales related to HomeWorx.  N.T. 6/12/23, 207-209, N.T. 6/13/23, 50-52, 76-79.

40.  As AFI's office manager, Diane Aiello is responsible for overseeing the accounts payable, accounts receivable, customer service, purchasing and shipping.  N.T. 6/13/23, 61.  As part of these functions, it is Aiello's responsibility to generate or prepare invoices to customers, as well as make sure invoices from vendors are paid.  *Id.*  63-65.  She uses the QuickBooks program to do and track everything.  *Id.*  In addition to Aiello, Eric Albee is the only other person at AFI who uses the QuickBooks login credentials.  *Id*. at 68.

41.  On October 18, 2017, Eric Albee created an invoice on behalf of AFI directed to White Bear Trading Company seeking payment of $50,000 which he emailed to Ryan Willits.  *Id.*, 50-53, 83-84, 189-191; Ex. 15.  Notwithstanding that Diane Aiello was AFI's office manager, Eric Albee did not copy her on the email, provide her with a copy of the invoice or discuss it with her.  *Id*.  As a result, she never made an entry into AFI's books to show White Bear owed $50,000.  *Id.* at 84-85.

42.  AFI makes interest-only monthly payments in the range of $1,400 to $1,600 on the $250,000 working capital loan to Univest through automatic withdrawal.  N.T. 6/13/23, 85.  That loan remains collateralized by Paul and Mary Ann Albee's home.  *Id.* at 85-86.  Despite the working loan, which is for the most part maxed-out, additional bills for things like raw materials which AFI lacks the finances to pay often arise.  *Id*. at 73-74; N.T. 6/12/23, 141. When this occurs, Paul and Mary Ann Albee or P3N, Paul's consulting company, have infused the necessary funds to AFI to pay these bills, by depositing monies into AFI's account or charging the outstanding bills

to their own credit cards.  N.T. 6/13/23, 65-66, 73-74; N.T. 6/14/23, 197-198.  Diane Aiello keeps track of these infusions, which are deemed loans, on both a separate Excel spreadsheet and in the QuickBooks general ledger.  *Id.*; Exs. 61, 68, 69.

43.    Diane Aiello has regularly informed Eric Albee that his parents are putting money into the company and he has never objected to them doing so.  *Id.* at 69.  Currently, the total amount owed by AFI to Paul and/or Mary Ann Albee and/or P3N is $439,806.  *Id.* at 70-73.  Because Eric Albee is rarely in AFI's office, Aiello does not turn to him for help in paying AFI's expenses.  *Id.* at 74.

44.    In the fall of 2019, Eric Albee needed money and sought to access the funds in his 401k with AFI.  Because the only way he could access those monies was by resigning his employment with AFI and cashing out his 401k, Eric resigned as a paid employee but retained his 54% shareholder interest in AFI.  After cashing out his 401k, Eric did infuse $10,000 into AFI for payment of bills.  Since then, Eric has not loaned or contributed any money to AFI.  N.T. 6/13/23, 90-93, 197-198.

45.    While working at AFI, both Paul and Eric Albee have long done consulting work, formed other business entities, and engaged in other business ventures.  N.T. 6/12/23, 118-119, 209-213, N.T. 6/13/23, 95-96; N.T. 6/14/23, 84, 150-151.  There is no written agreement between the AFI shareholders concerning the circumstances under which they can provide consulting services or use technology developed at the company.  Rather, there exists only the written corporate resolution made when Sandra Keeley resigned in June 2016 in which she alone agreed "that all technology, intellectual property, patents or other funded (sic) by Aromatic Fusion will remain the sole property of Aromatic Fusion, whether listed in the name of the corporation or in the name of individuals."  N.T. 6/14/23, 110-115; N.T. 6/20/23, 18-19.  Ex. 34.  Notwithstanding

the actual language of the resolution and its failure to specify what technology, property or patents are covered, Eric Albee believes this resolution applied to him and his father as well as his sister. *Id*. at 115-116.  Paul Albee does not share this belief; rather it was his understanding and intent that this related solely to Sandra's departure from the company and her sole agreement to release any and all of her interests in AFI's technology and property.  N.T. 6/20/23, 18-19.

46.    In addition to White Bear Trading Co., Eric Albee has another business, Aroma43, through which he sells candles and scented/fragrance reeds at craft fairs and local stores.  6/12/23, 131, 210-212; N.T. 6/13/23, 95-96; N.T. 6/14/23, 37.  Fragrance reeds are long, colored, fragranced "lollipop" sticks which are used in a diffuser or simply placed in a vase to fragrance ambient air.  6/12/23, 109-110.  AFI also sold fragrance reeds as part of its product line, primarily to Air Essentials.  *Id*.; Ex. 26.

47.    Aroma43 bought many of the materials it needed for the scented reeds from AFI. Eric Albee asked AJ Campione, AFI's production manager, to make packs of the reeds for Aroma43 in batches of 2,000 to 5,000.  N.T. 6/14/23, 37-38.  Although Aroma43 was originally Eric Albee's sole proprietorship, with the formation/incorporation of White Bear Trading Company, Aroma43 became a brand owned by White Bear to which all proceeds from Aroma43's sales and/or revenues are now directed.  N.T. 6/13/23, 224; 6/14/23, 37.  Despite Air Essentials having long been an AFI customer, White Bear also now sells scented reeds to Air Essentials.  *Id*. 223-228; Ex. 26.  Between 2018 and 2020, White Bear received $11,867 in revenue from Air Essentials.  Ex. 28.

48.    In 2017, Eric Albee also provided consulting services to PLZ Aeroscience for which he received $75,000 in compensation.  N.T. 6/14/23, 115-117; Ex. 17.  Eric did not turn any of these  consulting fees over to AFI.  *Id***.** at 117.

49.    In 2007, while still working at ROWA, Inc., a plastics manufacturing company, Paul Albee began working with Eric and Sandra on a few different projects.  N.T. 6/12/23, 122-123. Shortly after he retired from his job with ROWA, Paul joined AFI, initially with the intention of helping Sandra and Eric with simple tasks such as installing shelving and painting; he did not have and did not want any management or other responsibilities.  N.T. 6/14/23, 151-153.  In the beginning, Paul would go to AFI a few times a week but this gradually changed, and eventually he was working every day.  N.T. 6/12/23, 126-127; N.T. 6/14/23, 152.  Presently, Paul Albee continues to be involved full-time with AFI and now manages much of the company's activity, together with Diane Aiello.  N.T. 6/14/23, 152-154.  Despite his full-time work schedule, Paul has never received any monetary compensation for working at AFI.  *Id.*; N.T. 6/12/23, 118, 126; 6/13/23, 94-95; N.T. 6/14/23, 154.

50.    Paul Albee had long done consulting work for the plastics industry, and he continued consulting after joining AFI.  N.T. 6/12/23, 117-118, 209-210; N.T. 6/13/23, 95.  Paul would nearly always follow up a meeting or consulting appointment by preparing a "call report," outlining the meeting and what potential business might result from it.  N.T. 6/12/23, 119, 211-212.  The call reports were kept in a file stored behind Diane Aiello's desk and were accessible to everyone.  N.T. 6/12/23, 212.  Eric Albee did not prepare call reports but he would write notes. *Id*.  Paul Albee's consulting activities often generated business for AFI, and his, Eric's and A.J. Campione's consulting activities were well known and discussed by everyone involved in the business of AFI.  N.T. 6/12/23, 117-118, 209-215; N.T. 6/13/23, 95-96; N.T. 6/14/23, 117.  Eric's separate projects did not result in work for AFI.  N.T. 6/13/23, 53-54, 95-96.

51.    Paul Albee formed P3N to apply for grants from the United States Forest Service and is the consulting firm through which he now does much of his consulting work.  N.T. 6/14/23,

150-151; N.T. 6/20/23, 27-28, 32-33.  During COVID, P3N was able to qualify for certain loans which AFI by itself or doing business as Addisperse could not.  N.T. 6/14/23, 199.  P3N took out a $25,000 loan which it then loaned/used to pay AFI's rent and other expenses.  *Id.*; Ex. 60.

52.   Both Paul and Eric Albee at various times enlisted A.J. Campione to help with their consulting projects using AFI's facility and/or resources.  N.T. 6/12/23, 214-216; N.T. 6/13/23, 18-25, 36, 54.  Campione was not taken away from the work he was doing for AFI to work on Paul Albee's consulting projects and he was never paid by P3N.  N.T. 6/12/23, 215-216.  Campione was never paid for his work on Eric Albee's projects either.  N.T. 6/13/12, 54.

53.   Paul Albee has at various times either brought laboratory equipment which he already owned to AFI, or bought new equipment for use at AFI using his own money.  N.T. 6/20/23, 14.  Included were a small, one-inch, single screw extruder, a microscope given to him when he was working at Lynn Plastics, and several small kettles he obtained while working at ROWA.  *Id.* at 15-17; N.T. 6/12/23, 125-126; Ex. 85.  Eric Albee was aware these items had been brought to AFI by his father and did not object.  N.T. 6/20/23, 15.  In bringing his equipment to AFI, Paul Albee did not intend it to then become the sole property of AFI, nor did he and Eric ever discuss the matter of the equipment's ownership.  *Id.*

54.   Simultaneous to his work with AFI, Paul Albee has also done consulting work for numerous businesses, individuals, and government agencies, including the Forestry Service, Chevron Phillips Chemical Company, American Process/AVAPCO/GranBio, and Kim Nelson, its chief technical officer, Milliken & Company, BOCO, Aaron Guan, Trigon Plastics, Celluforce, Roberto Galvez, SP Films, and Vandir.  N.T.6/20/23, 24-55; Exs. 19, 150-153, 155, 156-162, 170-172, 174, 176, 182, 184, 186, 188-196, 198, 207, 221-235.  Paul Albee's consulting work was focused in the field of chemistry, plastics additives, and polymers, in which he worked for over

fifty years.  N.T. 6/14/23, 144-150; N.T. 6/20/23, 24-55.  In his consulting work, Paul Albee did

not disclose any of AFI's trade secrets or proprietary information to any of the entities with which

he consulted.  N.T. 6/20/23, 35-42; Ex. 21.

55.     Several patents have been issued to one or more of AFI's principals since 2010.  N.T.

6/20/23, 20-21.  In or around 2014, a patent was issued to Eric Albee and Sandra Keeley for a

manufacturing process for a foaming or blowing agent concentrate that controls the amount of

moisture generated from the decomposition of blowing agent components.  *Id*. at 21-23.  A patent

was also issued to Paul Albee, Eric Albee and Sandra Keeley for a cube design, and another patent

was granted to all three AFI principals for a biodegradable biopolymer fragrance delivery system.

Still another patent was issued to Paul Albee alone in October 2022 related to the ability to disperse

nanoparticles from a water phase to a solid phase.  *Id.* at 19-24.  Apart from Sandra Keeley's

assignment of her interest in the above patents to AFI, the patents remain the property of the

individuals to whom they were issued, i.e., Paul and Eric Albee, not AFI.  *Id.*

56.     In 2020, while setting up his father's AFI email on his AFI computer, Eric Albee saw

emails from Aaron Guan of BOCO, Kim Nelson at American Process and from AVAPCO and

GranBio, Trigon, SP Films and Chevron Phillips.  N.T. 6/14/23, 38-44.  Eric Albee saw that Paul

Albee had earned "substantial monies" from these companies from his consulting activities which

Eric believed should have been turned over to AFI.  *Id.* at 44-45.

57.     Paul Albee's consulting work for Chevron Phillips began in 2019 and involved  the

development of a process for taking nano-sized material in water, replacing it with a polymer to

keep the particles separated and then dispersing it into a plastic and/or converting it into a solid

material.  From that, AFI/ d/b/a Addisperse could make a master batch or compound to be supplied

to Chevron and other companies for film production.  N.T. 6/20/23, 24-27; Ex. 198.  It was at or

around this same time that Paul Albee was trying to get a U.S. Forest Service grant to assist with developing this technology for use in converting small, discarded, wood fibers into nanoparticles for conversion into useful products.  N.T. 6/20/23, 27-28, 32-33.  If the technology could be developed, Paul believed it presented an opportunity for Addisperse to create a unique product and/or it would have given Addisperse "a leg up on the industry."  *Id*.; Ex. 188.

58.    On November 23, 2020, Eric Albee sent a letter to the Senior Vice President for Legal and Public Affairs/General Counsel and Secretary of Chevron Phillips on AFI/Addisperse letterhead.  In the letter, Eric alleged he recently learned that representatives of Chevron Phillips had been working with "individuals" from AFI, d/b/a Addisperse to "inappropriately use trade secrets from AFI.  These AFI trade secrets are in the area of crystalline cellulose filler, nano cellulose crystals, chitin whiskers and other nano materials, along with the pre-treatment, treatment and compounding of these into additive blends, pre-concentrates, additive concentrates, plastic compounds, finished film and other products."  N.T. 6/14/23, 79-81; Ex. 20.  The letter further claimed that "Chevron Phillips Chemical entered into an agreement with Paul Albee and P3N Technology with "full understanding that the trade secrets involved in this work were developed at and the property of AFI, not the property of Paul Albee personally or property of P3N Technology, Inc."  *Id*.  Eric Albee concluded the letter with the following proposal:

> As Chevron Phillips Chemical seems to have a deep interest in this technology, I would be open to discussing the sale of my controlling interest in AFI to Chevron Phillips Chemical.  I have asked that actions on civil and criminal fronts be briefly paused while I explore a more gentlemanly approach of offering to sell my controlling interest in AFI to the companies most aggressively interested in this AFI technology, Chevron Phillips Chemical being significant among them.  The ownership, protection, and incredible future potential of these AFI trade secrets can then pass along to the company that chooses to acquire my interest in AFI.

*Id*.

59. Paul Albee did not hide his consulting work with Chevron Phillips or his attempt to secure grant monies from the U.S. Forest Service to help fund the development of his nano and crystalline cellulose filler technologies. N.T. 6/13/23, 38-42; N.T. 6/20/23, 29; Exs. 92, 94. To the contrary, Paul memorialized most of his interactions with Chevron Phillips into the call reports stored next to Diane Aiello's desk and which are accessible to everyone. N.T. 6/20/23, 29.

60. Eric Albee did not share a copy of the letter which he sent to Chevron Phillips or discuss it or any of its contents with Paul Albee before sending it. N.T. 6/20/23, 29-30. As a result of this letter, Chevron Phillips terminated all contacts and relationships with AFI, Paul Albee and/or P3N. *Id.* at 31-32. AFI therefore received no business from or with Chevron Phillips and did not get the grant from the Forest Service. *Id.*; N.T. 6/13/23, 42-43. Chevron Phillips declined Eric Albee's offer to sell his interest in AFI to it. Ex. 21.

61. Although as a consultant, Paul Albee was usually paid for his time and expenses, he did not receive any compensation or revenue from his work with BOCO and Aaron Guan nor did his work result in any business for AFI/Addisperse. N.T. 6/20/23, 39-43; Ex. 165. His consulting work did result in generation of some business for AFI with Trigon, CelluForce, and Roberto Galvez/Vandir/SP Films. *Id.* at 45-52.

62. White Bear Trading Company's General Ledger report for 2017 reflects that it had income from sales of HomeWorx products totaling $1,019,551 and that it paid a total of $738,718.42 for supplies and materials (costs of goods sold) to Wealthy Lane International. N.T. 6/14/23, 6, Ex. 17. As reflected on its Federal Income Tax return for 2017, whether from HomeWorx or other sources, White Bear reported total gross receipts or sales of $1,518,408 for the year, and stated its costs of goods sold were $806,227. This resulted in a gross profit to White Bear of $712,181 for 2017. N.T. 6/14/23, 74-75; Ex. 18. These figures are in keeping with what

Paul Albee expected AFI to realize from the HomeWorx project had it not been transferred to White Bear.  N.T. 6/14/23, 187-189.

## PROCEDURAL HISTORY

Paul Albee commenced this action on September 7, 2021 individually and derivatively on behalf of AFI against Eric Albee, White Bear Trading Company and AFI, as a nominal defendant, alleging breach of fiduciary duty, shareholder oppression, tortious interference with contractual relations, and unjust enrichment.  ECF No. 1.  In his Amended Answer to the Complaint, Eric Albee on his own behalf and on behalf of AFI and White Bear Trading Company, counterclaimed against Paul Albee for embezzlement/fraudulent conversion of company funds belonging to AFI, tortiously interfering with existing and prospective contractual relationships, violations of the federal Defense of Trade Secrets Act, and the Pennsylvania Uniform Trade Secrets Act, and breach of fiduciary duty/duty of loyalty.  Def.'s Am. Ans. to Compl., 18-28, ECF No. 35.  The counterclaim also sought the corporate dissolution of AFI.  *Id.* at 29.  In the Second Amended Third-Party Complaint of Eric Albee and Aromatic Fusion attached to the Amended Answer, these same causes of action were asserted against P3N Technology, Inc., Sandra Albee-Keeley and Mary Ann Albee, along with a claim that Sandra Albee-Keeley and Mary Ann Albee engaged in aiding and abetting Paul Albee's breach of fiduciary duty and duty of loyalty.  *Id*. at 32-45.

The matter was heard non-jury before the undersigned over a five-day period commencing on June 12, 2023 and continuing on June 13, 14, 20 and 21, 2023.  Shortly after the trial concluded, Eric Albee was ordered to file a brief in support of his argument to dismiss all of Paul Albee's claims on the grounds they were barred by Pennsylvania's two-year statute of limitations.  Order, June 21, 2023, ECF No. 57.  Following briefing, the Court determined the law of New Jersey, as

the state in which AFI was incorporated, was applicable to the claims raised in this case and denied the motion to dismiss on June 29, 2023.  Order, June 29, 2023, ECF No. 63.

## <u>DISCUSSION</u>

*Claims Raised in Paul Albee's Complaint*

The Court first addresses Paul Albee's claims against Eric Albee and White Bear Trading Company on behalf of himself and derivatively on behalf of AFI.  These claims (for shareholder oppression, breach of fiduciary duty, tortious interference with contractual relations, and unjust enrichment) arose out of Eric Albee and Aroma 43/White Bear's actions regarding AFI's work on the HomeWorx project and with Chevron Phillips.

Shareholders' actions under New Jersey law are governed by the relevant provisions of the Corporations Act, N.J.S.A. 14A: 3-6, *et. seq.*  A pre-condition to commencement of a derivative proceeding is the submission of a written demand upon the corporation to take a suitable action, to be followed by a period of ninety days within which the corporation must act.  N.J.S.A. 14A: 3-6.3.  Once expired, a derivative action may be filed.  *Id.*  As alleged in Paul Albee's Complaint and admitted in Eric Albee's Second Amended Answer, such a demand letter was sent on March 18, 2021.  Compl., ¶ 44, ECF No. 1; Am. Ans., ¶ 44, ECF No. 35.  As there was no amicable resolution as demanded and the Complaint was not filed until September 7, 2021, the case is properly treated as a derivative action.

In Count I of his Complaint, Paul Albee makes a claim in his individual capacity against Eric Albee pursuant to the New Jersey Oppressed Shareholder Statute, N.J.S.A. § 14A:12-7.  Under § 14A:12-7(1)(c), which applies to corporations with 25 or fewer shareholders, the Court is empowered to appoint a custodian or provisional director, order a sale of the corporation's stock, or enter a judgment dissolving the corporation if "the directors or those in control have acted

fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees." A "minority shareholder" is one who does not have control of the corporate shares with respect to voting rights, regardless of the percentage of their ownership interest. *Berger v. Berger*, 592 A.2d 321, 327-328 (N.J. Super. Ct. Ch. Div. 1991).

Ordinarily, "oppression by shareholders" is shown "when they have awarded themselves excessive compensation, furnished inadequate dividends, or misapplied and wasted corporate funds." *Muellenberg v. Bikon Corp.*. 669 A.2d 1382, 1388 (N.J. 1996). Additionally, "oppression" has been defined as "frustrating a shareholder's reasonable expectations." *Brenner v. Berkowitz*, 634 A.2d 1019, 1028 (N.J. 1993). Because N.J.S.A. 14:12-7(1)(c) "is written in the disjunctive," a finding of either fraud or illegality, without a finding of oppression, may be sufficient to permit a court to conclude the statute has been violated. *Id*. at 1032. "However, in addition to demonstrating fraudulent or illegal conduct, mismanagement, or abuse of authority, *or* oppressive or unfair conduct, a plaintiff must also demonstrate a nexus between that misconduct and the minority shareholder or [his] interest in the corporation." *Id*. at 1028. The courts should consider the seriousness of the violation, whether the misconduct thwarts the minority shareholder's reasonable expectations of his or her role in the corporation, and what remedy is appropriate to redress the harm. *Brenner*, 634 A.2d at 1029-30. Importantly, even when the statute is triggered, the trial court has discretion to choose the appropriate remedies, and is not limited to the statutory remedies; a wide array of equitable remedies are available. *Id.* at 1033.

The Court finds it was reasonable for Paul Albee to expect Eric Albee to act in the best interests of AFI. Indeed, there was no reason why Paul *wouldn't* have expected Eric to continue

to expend the same efforts into generating new products and business for AFI that he had expended when he first started the business and before he relocated to Florida given Eric's assurances that he would do just that.  But the trial record reflects otherwise.  Rather, beginning in 2014 after he divorced and moved to Florida, Eric participated less and less in AFI's operations, focusing instead on his own separate ventures, such as Aroma43 and White Bear.  Despite promising his father that he would work for AFI while living in Florida just as he had while living in New Jersey and would split his time between the two states, over the ensuing years, Eric Albee's trips to Pennsylvania became less and less frequent.  On those occasions when he was working in the Bensalem office, Eric largely stayed behind his closed office door and engaged very little with other company members or employees.  He no longer secured any of AFI's credit lines and, apart from loaning $10,000 after cash-out of his AFI 401k, Eric Albee did not loan or provide any other financial support or backing to the company.  Nor did Eric make any efforts to secure alternative financing for AFI, such as he and Sandra Keeley had obtained to finance development and production of the Scentbug.  To the contrary, Eric refused to even discuss exploring new ways to obtain new capital to assist in paying the Chinese manufacturer for the HomeWorx project.

Paul Albee also had a reasonable expectation that since AFI had completed nearly all the work for the HomeWorx project, it would receive the orders, would oversee manufacturing of the products, and would receive the profits from the sales.  However, unbeknownst to Paul, Eric had incorporated White Bear Trading Company in Florida with a partner, Ryan Willits, and unilaterally "transferred" the HomeWorx work to White Bear.  Claiming there was an unwritten "technology sharing agreement" between AFI and White Bear pursuant to which White Bear paid AFI a flat fee of $50,000 for use of its technology and development of product samples, Eric thus re-directed all HomeWorx orders and profits to White Bear.  In so doing, Eric Albee acted fraudulently and/or

24

illegally, abused his authority as AFI's majority shareholder and/or president, and mismanaged AFI to benefit himself and White Bear Trading Company, thus frustrating Paul Albee's reasonable expectations and harming him and AFI.  Eric Albee's conduct constitutes shareholder oppression under New Jersey's statute entitling Paul Albee to relief on Count I of his Complaint.

In Counts II and III of the Complaint, Paul Albee claims Eric Albee breached the fiduciary duties which he owed both to Paul himself as the minority shareholder and to AFI.  To establish a cause of action for breach of fiduciary duty under New Jersey law, "a plaintiff must show that: (1) the defendant had a duty to the plaintiff; (2) the duty was breached; (3) injury to the plaintiff occurred as a result of the breach; and (4) the defendant caused that injury."  *Namerow v. PediatriCare Associates, LLC*, 218 A.3d 839, 846 (N.J. Ch. Div. 2018).  The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position.  *F.G. v. MacDonell*, 696 A.2d 697, 703-704 (N.J. 1997).  The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care.  *Id.* at 704.

Stockholders of closely held corporations have a duty of "utmost good faith and loyalty" to the corporation as well as to each other.  *Muellenberg*, 669 A.2d at 1386.  Majority shareholders and directors have a fiduciary duty to treat minority shareholders fairly and with the "utmost fidelity," and to refrain from "using their powers for their own personal advantage to the detriment of the minority shareholders."  *Casey v. Brennan*, 780 A.2d 553, 568 (N.J. App. Div. 2001), *aff'd*, 801 A.2d 245 (N.J. 2002).  "[C]orporate officers and directors who engage in self-dealing transactions have a heavy burden of showing that they have not violated their fiduciary obligations to the minority stockholders."  *Berkowitz v. Power/Mate Corp.*, 342 A.2d 566, 574 (N.J. Ch. Div.

1975).  "At a minimum, their conduct is subject to a searching inquiry to determine whether it conforms to accepted concepts of fairness and equity."  *Id.*

The Court finds Eric Albee breached the fiduciary duties which he owed to both Paul Albee and AFI in several ways.  First, he diverted AFI's business opportunity with HomeWorx to White Bear.  "The corporate opportunity concept is one aspect of a general rule that a fiduciary's loyalties may not be divided."  *Valle v. N. Jersey Auto. Club*, 359 A.2d 504, 507 (N.J. App. Div. 1974), *aff'd,* 376 A.2d 1192 (N.J. 1977).  To prove the diversion of a corporate opportunity, a plaintiff must show that:

> (1) a corporate officer or director is presented with a business opportunity; (2) "the corporation is financially able to undertake" the opportunity; (3) the opportunity, by its nature, is "in the line of the corporation's business and is of practical advantage to it[]"; (4) "the corporation has an interest or reasonable expectancy[]" in the opportunity; and (5) "by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with" the interests of the corporation.

*Alper v. Simon*, No. A-2016-11T4, 2014 WL 2864988, at *21 (N.J. App. Div. June 25, 2014) (quoting *Valle*, 359 A.2d at 507).  If these elements are met, "the law will not permit [the corporate officer or director] to seize the opportunity for himself."  *Valle,* 359 A.2d at 507 (quoting *Guth v. Loft*, 23 Del. Ch. 255, 5 A.2d 503 (Sup. Ct. 1939)).  "And if, in such circumstances the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests, and profits so acquired."  *Id.*[1]

The trial record evinces that all the corporate opportunity doctrine elements are met here.  Harry Slatkin/Slatkin & Co. presented the HomeWorx opportunity to Eric Albee in

---

[1]     As noted by the Appellate Division in *Valle*, "New Jersey subscribes to this view of corporate opportunity."  *Id.* (citing *Solimine v. Hollander*, 128 N.J. Eq. 228, 246 (Ch. 1940).

his capacity as AFI's president and/or majority shareholder in 2016. AFI then began working with fragrances and gel material and doing design work on a little gel disc to be used in warmers and a battery-operated pillar candle with fan, and presented several product ideas and concepts to Slatkin. AFI also entered into agreements with Slatkin and following its incorporation, with HomeWorx. By early 2017, AFI had completed virtually all the work necessary to enable the project to move forward and manufacturing to begin. Eric Albee testified that he "transferred" the project to White Bear to "save it" because AFI owed a debt to the Hong factory which precluded the factory from manufacturing the HomeWorx products for AFI. However, credible evidence exists showing the debt had been written off. Further, the Court does not find Eric Albee's testimony credible, given he failed to discuss or disclose to anyone at AFI: (1) the formation of White Bear, (2) the "transfer" of the HomeWorx contract to it, or (3) the existence of the unwritten "technology sharing agreement." Moreover, AFI had no difficulty in having the Hong factory manufacture its products for other customers, despite the existence of the supposed receivable. By usurping the HomeWorx contract and seizing and "transferring" the opportunity to White Bear, Eric Albee robbed AFI of the opportunity to earn several hundred thousand dollars. In so doing, he harmed not only AFI, but also his father and mother, who were continuing to infuse funds into AFI, and secure its credit line with their New Jersey home.[2]

---

[2]    While breach of fiduciary duty is traditionally a derivative claim, it may also be brought personally if "the oppressed minority shareholder can establish an injury distinct from the injury suffered by the shareholders in general." *Weil v. Express Container Corp.*, 824 A.2d 174, 182 (N.J. App. Div. 2003). Inasmuch as Eric Albee is no longer securing any of AFI's debt, the Court finds Paul Albee has shown an injury distinct from the only other AFI shareholder.

Eric Albee also breached the fiduciary duty of loyalty which he owed to AFI by writing to Chevron Phillips and threatening civil and criminal action unless it stopped working with AFI.   Because of that letter and the threats made therein, AFI lost out on the opportunity to produce the nanomaterials which Paul Albee was working to develop for Chevron and the U.S. Forest Service, and lost its opportunity for grant funding from the Forest Service for a similar project.   AFI also lost any potential it might have had to garner future development and/or production work for both entities.   Again, the Court finds Eric Albee's testimony that he wrote the letter to Chevron to protect AFI's intellectual property incredible.   There was no agreement with respect to the ownership and treatment of AFI's confidential and intellectual property save for that signed by Sandra Keeley when she left the company.   That agreement was silent as to its application to anyone other than Sandra. Further, Eric had long known of his father's consulting work and that it often generated work for AFI on the "additive side" of the business.   Prior to his usurpation of the HomeWorx project, Eric never objected to Paul's consulting or development work; to the contrary, both A.J. Campione and Eric himself had also consulted with other entities while working for AFI.   Because Eric breached the fiduciary duties which he owed to AFI,  Paul Albee is also entitled to relief on Counts II and III of the Complaint.

In Counts IV and V, Paul Albee derivatively raises claims against White Bear Trading Company on behalf of AFI for tortiously interfering with AFI's contract and business with HomeWorx and for being unjustly enriched from "the significant time, costs and administrative expenses incurred by [AFI] to research and develop the products sold to HomeWorx."   Compl. ¶ 71.

New Jersey recognizes claims for both tortious interference with a contract and tortious interference with a prospective contractual relationship. *Nostrame v. Santiago*, 61 A.3d 893, 900 (N.J. 2013). A cause of action for tortious interference with an existing contract arises where "one . . . intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 766). There are four elements which must be shown to recover for the tort of interference with a contract: (1) a protected interest; (2) malice (that is, a defendant who was not a party to the contract intentionally interfered without justification or excuse); (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages. *Russo v. Nagel*, 817 A.2d 426, 432 (N.J. App. Div. 2003); *Dimaria Const., Inc. v. Interarch*, 799 A.2d 555, 560 (N.J. App. Div. 2001), *aff'd*, 797 A.2d 137 (N.J. 2002).

"The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Goldsmith v. Camden Cnty. Surrogate's Off.*, 975 A.2d 459, 462 (N.J. App. Div. 2009). Accordingly, "[a] cause of action for unjust enrichment requires proof that 'defendant received a benefit and that retention of that benefit without payment would be unjust.'" *County of Essex v. First Union Bank*, 862 A.2d 1168, 1172 (N.J. App. Div. 2004) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994)). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp.*, 641 A.2d at 526.

A constructive trust on property is an appropriate remedy to "prevent unjust enrichment and force a restitution to the plaintiff of something that in equity and good conscience does not

belong to the defendant." *Elsayed v. Elsayed*, No. A-3613-20, 2022 WL 1817045, at *28 (N.J. App. Div. June 3, 2022) (quoting *Flanigan v. Munson*, 818 A.2d 1275, 1281 (N.J. 2003)). To impose a constructive trust, a court must find one of the parties "has committed a 'wrongful act;'" and "second, the wrongful act must result in a transfer or diversion of property that unjustly enriches the recipient." *Flanagan*, 818 A.2d at 1281 (quoting *D'Ippolito v. Castoro*, 242 A. 617, 619 (N.J. 1968)).

Unjust enrichment may also constitute a ground for imposing an equitable lien. *VRG Corp.*, 641 A.2d at 523. "An equitable lien constitutes a special right that is a combination of a legally cognizable debt and a binding agreement to subject property to the payment of that claim." *Highland Lakes Country Club & Comm. Ass'n v. Franzino*, 892 A.2d 646, 654 (N.J. 2006). "[F]or an equitable lien to arise there must be a debt owing from one person to another, specific property to which the debt attaches, and an intent, expressed or implied, that the property will serve as security for the payment of the debt." *Id.*

As is apparent from the testimony and documentary evidence produced at trial, a contractual relationship existed between AFI and HomeWorx for the development of fragrances and fragrance products to be sold primarily on the QVC Home Shopping Network under the HomeWorx brand. Although it was not reduced to a formal written document, the existence of the contract between AFI and HomeWorx is reflected in the vendor set-up forms prepared by Sandra Keeley and the emails and non-disclosure agreements exchanged between the two entities, as well as by all the work which AFI performed relative to the project. In "transferring" the HomeWorx project and assuming control of the product manufacturing with Wealthy Lane and the Hong factory, Eric Albee and Ryan Willits, acting in their capacities as principals in White Bear, intentionally interfered and destroyed the business relationship between AFI and HomeWorx. That the actions

were intentionally calculated to do just that is clearly demonstrated in the numerous emails sent by Eric Albee to HomeWorx' Jimmy LeFevre and Yvonne Franco in March 2017 and by the sudden and unexplained appearance of a $50,000 draft into AFI's account from Ryan Willits' attorney trust account in October of 2017.  As a result of White Bear's actions, AFI lost all the profits it would have made from the project.

The profits lost by AFI were instead realized by White Bear.  According to White Bear's income tax return for 2017, it reported total gross receipts or sales of $1,518,408 for the year, and stated its costs of goods sold were $806,227.  Thus, for 2017, White Bear realized a gross profit of $712,181.  While the sources of the receipts are not shown on the tax return, White Bear's General Ledger report for 2017 shows it recorded income from sales of HomeWorx products in the amount of $1,019,551, and paid $738,718.42 for supplies and materials (costs of goods sold) to Wealthy Lane International.  Thus, it is reasonable to conclude that had White Bear not interfered with AFI's contractual relationship with HomeWorx, AFI would have realized profits from the HomeWorx project in an amount that was somewhere between $280,833 and $712,181. The court finds imposition of a constructive trust or an equitable lien in the amount of the profits which White Bear reaped from the HomeWorx  project in favor of AFI is an appropriate remedy.

*Claims Raised in Eric Albee's Counterclaim and Third-Party Complaint*

Before judgment may be entered in favor of either Paul Albee or AFI, it is incumbent upon the Court to consider and address the claims made by Eric Albee in his Counterclaim and Third-Party Complaint.  Turning first to the Counterclaim, in Count I, Eric and AFI assert Paul breached his fiduciary duty and duty of loyalty.  Count II alleges Paul tortiously interfered with AFI's existing and prospective contractual relationships.  In Count III, Eric and AFI seek damages for Paul's alleged embezzlement and fraudulent conversion of AFI's property.  Counts IV and V raise

claims on behalf of AFI under the federal Defense of Trade Secrets Act, 18 U.S.C. § 1831, *et. seq.*, (DTSA), and the Pennsylvania Uniform Trade Secrets Act, 12 PA. CONST. STAT. § 5301, *et. seq.*, (PUTSA).  Finally, in Count VI, Eric seeks the corporate dissolution of AFI.  While all of Eric's claims invoke Pennsylvania law, in keeping with the Order of June 29, 2023, the Court evaluates them pursuant to the law of New Jersey.

The gist of the breach of fiduciary duty/duty of loyalty and tortious interference claims against Paul arise out of his alleged use of AFI's proprietary information "regarding nano-cellulose processes and products and entering into personal contracts to provide services to AVAPCO/Gran Bio, Chevron and BOCO that competed with [AFI] while in direct control of, engaged with and compensated by the company."  Second Am. Counterclaims of Eric Albee 20, ¶ 43, ECF No. 35. It is further alleged that AVAPCO/Gran Bio, Chevron, BOCO, SP Films and Plastiques Lausa were AFI's customers whom Paul diverted to himself, as well as the payables due to AFI from those customers, and that Paul's patents on dry preparation of free flowing nano-cellulose particulate belonged to AFI.  *Id.* at 44, ¶ 71.

These allegations have not been proven.  To the contrary, the record reflects that the relationships between AFI and AVAPCO/Gran Bio, BOCO, SP Films, Chevron, and Plastiques, among others, all resulted from Paul Albee's expertise in plastics and plastics additives research and development, and his consulting work focusing in those areas.  Paul did not hide his consulting activities: he recorded them in call reports which were stored in an open area for anyone to view at AFI's Bensalem location.  The record evinces Paul engaged in such consulting almost from the beginning of his affiliation with AFI, and the creation and build-up of the additive side of the business resulted from his efforts, experience, and expertise.  Paul was never compensated for his work at AFI, other than being provided a company car, and he therefore usually kept the consulting

fees which he earned and/or deposited them into P3N.  In any event, the evidence also reflects that at least some of these funds were indeed returned to AFI, albeit in the form of loans made by Paul and Mary Ann Albee and/or P3N to pay AFI's ongoing operating expenses and service its debt. The Court thus concludes Eric Albee had or should have had full knowledge of his father's consulting activities and the benefits which AFI was realizing as a result long before working on Paul's AFI email account in 2020.  Eric's testimony on these matters is disingenuous at best.

What's more, Paul Albee was not the only AFI shareholder or employee engaging in outside consulting.  Eric Albee and A.J. Campione also did consulting at various times and neither of them were required to disgorge the monies which they received for doing so to AFI either. While Paul was the owner of several patents, including the one issued in October 2022 relating to the development of preparations for dispersing nanoparticles from a water phase to a solid phase, Eric also co-owned patents with both Paul and Sandra Keeley.  Neither Eric Albee nor Paul Albee were ever parties to any agreement(s) regarding the ownership of these patents, and, while Sandra assigned her interest in the above patents to AFI when she resigned from the company, Paul and Eric Albee otherwise maintain their personal ownership interests in their own patents.  The only evidence regarding the alleged misappropriation or use of AFI's patents came from Eric's testimony at trial.  The Court has not found that testimony to be either credible or supported by the objective evidence.  There has been no showing that Paul Albee breached his fiduciary duty and/or duty of loyalty to AFI, or that he tortiously interfered with AFI's existing and prospective contractual relationships.  In the absence of proof,  these claims fail and judgment shall be entered in favor of the Counterclaim Defendants and against the Counterclaim Plaintiffs on Counts I and II.

In Count III of the Counterclaim, Eric Albee and AFI assert that Paul Albee embezzled and/or fraudulently converted payables owed to AFI from SP Films and Plastiques Lausa.

Traditionally, embezzlement was a criminal offense under New Jersey law, requiring a showing of the following elements: (1) a relationship between the owner of the money and the defendant; (2) that the money alleged to have been embezzled had come into the defendant's possession by virtue of this relationship; and (3) the defendant intentionally appropriated or converted that money. *State v. Thyfault*, 297 A.2d 873, 879 (N.J. Law Div. 1972) (citing *State v. Kennedy*, 296 A.2d 65, 66 (N.J. 1972) and N.J.S.A. 2A: 102-5). Similarly, "[t]he crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis*, 978 A.2d 281, 288 (N.J. App. Div. 2009). "Conversion does not require that defendant have an intent to harm the rightful owner or know that the money belongs to another." *Id.* Thus, proof that the money was obtained by fraudulent means is not required. *Id.* at 289.

Again, the evidence produced at trial fails to meet the burden of proof needed to sustain these claims. Notwithstanding Eric's testimony that his father made money from other companies which should have gone to AFI, the record reflects that Paul Albee was being paid for his consulting work. In the case of SP Films, Paul's consulting did result in a small job for Addisperse: it developed a sample anti-fog additive concentrate product for SP Films' use in an application in Mexico. Addisperse invoiced for the work which it performed, but Paul Albee was not involved in collecting on invoices. Inasmuch as it was a normal course of dealing for the parties to keep any monies earned from their outside consulting or other ventures, the Court cannot find any unlawful embezzlement, misappropriation, or conversion of such funds by Paul Albee. Judgment shall therefore also be entered in Paul's favor on Count III of the Counterclaim.

Counts IV and V of the Counterclaim seek recovery of damages under the Federal Defense of Trade Secrets Act and the Pennsylvania Uniform Trade Secrets Act.  Because New Jersey, not Pennsylvania law, is applicable to this matter, the Court shall apply the New Jersey Trade Secrets Act, N.J.S.A. 56: 15-1, *et. seq.* to evaluate the state law claim.

To state a private right of action under the Federal Defense of Trade Secrets Act, 18 U.S.C. § 1831, *et. seq.*, (DTSA) plaintiffs must show "(1) they own a trade secret and (2) that the defendant misappropriated the trade secret."  *Herley Indus., Inc. v. R Cubed Eng'g, LLC*, 2021 WL 229322, at *3 (E.D. Pa. Jan. 22, 2021); 18 U.S.C. §§ 1832, 1836(b)(1), (2)(ii)(IV).[3]  Under the New Jersey statute, a "trade secret" is defined as information that, *inter alia*, "derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." *Voorhees v. Tolia*, 2023 WL 4636738, at * 2 (3d Cir. July 20, 2023) (citing N.J.S.A. 56:15-2).  As under the federal statute, to prevail on a claim under the New Jersey Act, a plaintiff is also required to show

---

[3]   A "trade secret" is defined under the federal law to mean

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically graphically, photographically, or in writing if
>
> (A) the owner thereof has taken reasonable measures to keep such information safe; and
>
> (B)  the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.
>
> 18 U.S.C. § 1839(3).

that a trade secret was misappropriated and the plaintiff was damaged by the misappropriation. *Lard-Vid, LLC v. Ground Support Labs, LLC*, No. BER-L5929-20 Civ. A., 2021 WL 2396576 at *6 (N.J. Law Div. Feb. 26, 2021).

Eric Abee alleges Paul Albee "misappropriated Aromatic Fusion's trade secrets regarding the process of nanocellulose dispersion including sharing formula information that he knew was developed and/or owned and protected from disclosure by Aromatic Fusion and sold those trade secrets personally or by and through his wholly owned corporation, P3N Technology, Inc. to AVAPCO/Gran Bio, Chevron and BOCO for his own substantial economic gain." Am. Counterclaims of Eric Albee, 26, 28, ¶¶ 77, 89, ECF No. 35. However, at trial, Eric produced no evidence whatsoever to support these allegations. There was no showing that the claimed process was in fact a trade secret belonging to AFI, no showing of what measures AFI took to protect them, and no showing that this claimed trade secret(s) was ever compromised, disclosed, or sold to anyone. In fact, the nanocellulose dispersion process was the subject of the patent issued to Paul Albee alone in 2022 for which he alone performed all the research and development work, and for which he alone paid the expenses, including attorney fees, to obtain and which has not been assigned to AFI. N.T. 6/20/23, 19-21. The only evidence offered in support of these claims was Eric's own testimony that the matters on which Paul "engaged with" other companies involved "trade secret processes that were developed at AFI earlier," and this resulted in financial hardship to AFI because no revenues were coming to it or being shared with it from these companies. N.T. 6/14/23, 45. At trial, Eric did not specify what these processes were, or when or how they were purportedly disclosed during Paul's engagements. Again, the revenues which Eric contends were unlawfully diverted were the fees Paul was paid for consulting. Further, while Eric also reported confronting Paul about these matters in a meeting at which A.J. Campione and Diane Aiello were

present, neither of them testified to or about any such meeting. Campione stated only that he, Eric, and Paul all knew they had to watch what they said to others during their consulting work to ensure none of them were giving away information in such a way that other people or entities could "run away" with their technology, but he knew of no instance or situation in which Paul disclosed trade secrets or technology. N.T. 6/13/23, 215-216. In the absence of any evidence to support Eric Albee's claims of trade secret disclosure and/or diversion, judgment shall be entered in favor of Paul Albee on Counts IV and V of the Counterclaim.

In Count VI, Eric Albee seeks the corporate dissolution of AFI under 15 Pa. C.S.A. § 1981. AFI, however, is a New Jersey corporation and, consequently, the invocation of a law governing dissolution of Pennsylvania corporations is not applicable here. Corporate dissolution is "an extreme remedy to be imposed with caution after a careful balancing of the interests at stake," *Brenner v. Berkowitz*, 634 A.2d at 1030. Indeed, "caution is needed when determining corporate dissolution because the statutory remedy was meant only to protect the minority, not to provide a weapon." *Id*. (internal citation omitted). Neither party in this case has presented evidence regarding any of the interests which might be at stake in the event AFI is dissolved. Therefore, in lieu of entering judgment, the Court shall dismiss Count VI of the Second Amended Third Party Complaint without prejudice to the rights of the parties to seek dissolution of AFI in the appropriate forum and under the appropriate state's law.

Finally, as for the claims for aiding and abetting the breach of fiduciary duty and duty of loyalty of Paul Albee, tortious interference with existing and prospective contractual relationships, fraudulent conversion/embezzlement, and misappropriation of trade secrets which Eric Albee makes on behalf of himself and AFI in his Second Amended Third Party Complaint against P3N, Sandra Keeley and Mary Ann Albee, the Court shall enter judgment in favor of each of the

Counterclaim Defendants on all of these counts.  As noted, Paul Albee did not violate his fiduciary duties and/or his duty of loyalty to AFI or to Eric, as AFI's other, and majority, shareholder. Hence, neither Sandra Keeley nor Mary Ann Albee can be liable for aiding and abetting. Additionally, the Court credits the testimony of Paul Albee, Sandra Keeley, and Diane Aiello, and finds the payments made to Sandra and Mary Ann of which Eric complains were reimbursements for monies advanced and/or loaned to AFI to make payroll and/or pay operating expenses.  The sole support for the claims against these three defendants was Eric Albee's testimony at trial.  As has been previously discussed and with the few exceptions outlined in the factual findings, the Court has for the most part found Eric Albee's testimony incredible and entirely uncorroborated. The Court therefore now enters the following:

## CONCLUSIONS OF LAW

1.    This Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. §§ 1332 and 1367.

2.    As the majority shareholder and President of AFI, Eric Albee had a fiduciary duty to manage the company in a fair, honest, and equitable manner, to put the best interests of AFI and all its shareholders above his own, personal interests, and to act in furtherance of those interests at all times.  As the majority shareholder in a closely-held corporation, Eric Albee also had the utmost duty of loyalty to the corporation and to the minority shareholder to treat them fairly and with the utmost fidelity, and to refrain from using his powers for his own personal advantage to the detriment of the minority shareholders.  In diverting the scented reeds sales to Air Essentials from AFI to Aroma43/White Bear, diverting the HomeWorx contract and work from AFI to White Bear Trading Co., and in sending correspondence to Chevron Phillips threatening legal action while

offering to sell his interest in AFI to it, Eric Albee breached his fiduciary duties and his duty of loyalty to both Paul Albee and AFI.

3.     By usurping the opportunity which had been presented to AFI from Harry Slatkin and HomeWorx both before and following AFI's completion of all the work necessary for the project to move forward, and in selling the same scented reed products to Air Essentials as those previously sold by AFI, White Bear Trading Co. tortiously interfered with the contractual relationships between AFI and Air Essentials, and AFI and HomeWorx.  White Bear Trading Co. thereby deprived AFI of all of the profits and revenues resulting from the HomeWorx project, and from those fragranced reeds sales which AFI could have made to Air Essentials.  As a result of its interference, White Bear Trading Co. reaped the profits and revenues which otherwise would have gone to AFI, and has been unjustly enriched by the significant time expended by AFI in researching and developing the HomeWorx products, as well as the considerable costs and administrative expenses incurred by AFI during the development process.

4.     There was no evidence presented at trial quantifying the expenses incurred by AFI in its research and development of HomeWorx products and virtually no evidence as to its lost revenues or other damages, with the exception of the amounts reflected on White Bear Trading Company's General Ledger report for 2017 reflecting income from sales of HomeWorx products totaling $1,019,551 and payments totaling $738,718.42 for supplies and materials (costs of goods sold) to Wealthy Lane International.  The Court therefore finds that because of Eric Albee and White Bear Trading Company's tortious interference, AFI lost the revenue it would have made from selling the products which it developed for HomeWorx, and that White Bear was unjustly enriched at AFI's expense in the amount of $280,833.  Between 2018 and 2020, White Bear received $11,867 in revenue from selling scented reeds to Air Essentials.  Judgment in the amount

of $292,700 is properly entered in favor of AFI and against both White Bear Trading Co. and Eric Albee jointly and severally and in favor of Paul Albee in his derivative capacity on behalf of AFI on Counts III, IV and V of the Complaint.

5.      In his capacity as President and majority shareholder in charge and in control of AFI, Eric Albee acted fraudulently, unfairly, and oppressively toward Paul Albee as the minority shareholder and toward AFI's employees, abused his authority and mismanaged the operations of the company.  Judgment is properly entered in favor of Paul Albee personally and against Eric Albee on Counts I and II for minority shareholder oppression and breach of his fiduciary duties to Paul as minority shareholder of AFI.  Pursuant to N.J.S.A. 14A:12-7(1)(c), (4) and (8), a custodian shall be appointed to exercise all the powers of the board and officers of AFI to the extent necessary to manage the affairs of the corporation in the best interests of its shareholders and creditors unless a motion is made seeking the sale of all shares in the corporation to either the corporation itself or to Paul Albee or Eric Albee.

6.      Because none of the claims set forth in Eric Albee's Second Amended Counterclaim and Third Party Complaint have been proven, Judgment is properly entered in favor of Paul Albee, Mary Ann Albee, Sandra Albee Keeley and P3N Technology, Inc. and against Eric Albee, Individually and on behalf of Aromatic Fusion, Inc. in no amount.

An Order of Judgment follows.

BY THE COURT:


/s/  Juan R. Sánchez

_____
Juan R. Sánchez,        C.J.